**WYANDOTTE NATION, Plaintiff,**

v.

**The UNIFIED GOVERNMENT OF WYANDOTTE COUNTY/KANSAS CITY, KANSAS, et al., Defendants.**

No. CIV.A.01–2303–CM.

United States District Court, D. Kansas.

July 14, 2004.

John J. Gruttadaurio Joshua J. Strickland, NORAM Equities, Ltd., Maitland, FL, Sam L. Colville, Holman, Hansen & Colville, PC, Kansas City, MO, William D. McCullough, Jr., Mid–America Pipeline Company, Tulsa, OK, for Plaintiff.

Fred Bellemere, III, Seigfreid, Bingham, Levy, Selzer & Gee, Robert B. Best, Jr., Husch & Eppenberger, LLC, Stephen M. Bledsoe, Berkowitz, Stanton, Brandt, Williams & Shaw LLP, Stanley M. Burgess, Armstrong Teasdale LLP, Mark S. Carder, Stinson Morrison Hecker LLP, John R. Cleary, Mara H. Cohara, Loyd E. Owen, Jr.,

Lathrop & Gage, Douglas R. Dalgleish, Lathrop & Gage, Laurie Ann Novion, Shook, Hardy & Bacon L.L.P., Kansas City, MO, Ron Bodinson, Shook, Hardy & Bacon L.L.P., Overland Park, KS, James R. Borth, Olathe, KS, Jeffrey A. Bullins, Holbrook & Osborn, PA, Merriam, KS, Donald J. Cooper, Topeka, KS, Henry E. Couchman, Unified Government of Wyandotte County/KCK, Daniel B. Denk, Ryan B. Denk, John J. Jurcyk, Jr., Deryl W. Wynn, McAnany, Van Cleave & Phillips, P.A., Charles A. Getto, Carl A. Gallagher, Kimberly Diane McKamie, Wyandotte County District Attorney, Kansas City, KS, Frederick B. Farmer, Lowe, Farmer, Bacon & Roe, Olathe, KS, Bradley L. Farney McCaffree Financial Corporation, Leawood, KS, John C. Frieden, Clinton E. Patty, Frieden, Haynes & Forbes, Topeka, KS, Chelsi K. Hayden, Shook, Hardy & Bacon L.L.P., Lewis A. Heaven, Jr., Lathrop & Gage, LC, Mark D. Hinderks, Stinson Morrison Hecker LLP, Reid F. Holbrook, Thomas E. Osborn and Thomas M. Sutherland, Holbrook & Osborn, PA, M. Courtney Koger, Sanders Conkright & Warren LLP, Overland Park, KS, Brian R. Johnson, Lawrence, KS, Reginald E. McKamie, Sr., Houston, TX, Roger W. Warren, Sanders, Conkright & Warren LLP, Overland Park, KS, Kyle B. Russell, Shughart Thomson & Kilroy, PC, Kansas City, KS, Ilse L. Smith, Charles F. Speer, Kansas City, MO, Harold T. Walker, Unified Government of Wyandotte County/KCK, Kansas City, KS, for Defendants.

### MEMORANDUM AND ORDER

MURGUIA, District Judge.

This matter comes before the court on defendant The Unified Government of Wyandotte County/Kansas City, Kansas' Motion to Dismiss Plaintiff's Corrected Fourth Amended Complaint (Complaint) (Doc. 463), filed on behalf of itself and the defendant class, which has been joined by the following defendants: Certain–Teed Products and Certain–Teed Corporation (Doc. 465); Ashland Chemical, Inc., Groendyke Transport, Inc., Sylvester Carter, CPS Acquisition Corp., Larita J. Franklin, Evelyn M. Hudson, MCOD Investments LLC, Quindaro Proper-

ties, LLS, Rosecliff Realty Funding, Inc., Turtle Hill Townhomes, LP, Thomas Watson–El, and Vermuel J. Williams–Lewis (Doc. 466); BFS Retail & Commercial Operations, Central Investment Co., LTD, Hasty Partners LLC, Lawrence A. Jones Mortuary, Inc., Robert A. Nelson, Lynn M. Nelson, Leonard J. Pavlicek, Sunshine Building Co., Marilyn White, and First Hmong Christian Military Alliance Church (Doc. 467); Robert M. Modeer, Emily W. Modeer, HB Fuller Company, Brotherhood Bank Controller, Marcena Chandler, Luther Chandler, Herbert L. Kickens Sr., Joyce Dickens, Cellastine. Meeks, Richmond LLC, Marlene Shelby, Bona A. Taliaferro, Barbara J. Whiteside, Vernal D. Whiteside, Lester C. Williams, Aletha J. Williams, and International Brotherhood of Boilermakers, Ship Builders, Blacksmiths, Forger and Helpers (Doc. 468); General Motors Corporation, UAW Local 31, The Salvation Army, Acme Printing Ink Co., Atlantic Avenue Association, Brookwood Realty Company, Chrysler Investors, Con–Way Transportation, Dodge Partners, Dodge Road Company, Eighth St. Baptist Church, Inc., Eleventh Street Equity Partner, Forbo Adhesives LLC, GS Robins & Co., Paul E. Hayes, Imperbel Realty Partners, LLC, Johnson Food Equipment, Inc., Geraldine K. Jones, Kansas City Industrial Capital, James H. Kaplan, Joyce Kaplan, KCA LLC, Kesters Merchandising Display, Leggio Enterprises, LNPJ LLC, Beatrice McDaniel, Metals & Additives Corporation, Midwest Chandelier Company, Pandarama Pre School, Inc., Preston Refrigeration Company, Inc., Joseph D. Quinn, Teresa S. Quinn, R & H Building Corp., Salvation Army Inc., Gary E. Venable, Janet Venable, Water Conditioning, A.E. West Petroleum Co., Inc., Western States Fire Protection, William Bros. Pipe Line, Norma J. Woehrman, and 305 Sunshine Associates (Doc. 469); Fairfax Drainage District (Doc. 470); Union Pacific Railroad Company (Doc. 471);

The Kickapoo Housing Authority (Doc. 473); and Edwynne V. Harrison (Doc. 481).

## I.  Background

Plaintiff Wyandotte Nation, a federally recognized Indian tribe, seeks a declaratory judgment quieting title to land located in Kansas City, Kansas.  Defendants include the Unified Government of Kansas City and Wyandotte County, Kansas, and numerous private landowners.[1]  Plaintiff argues that a treaty executed in 1855, Treaty with the Wyandot[2], Jan. 31, 1855, U.S.-Wy. Tribe, arts. 1–4, 10 Stat. 1159–1161 (the 1855 treaty) between plaintiff and the United States did not extinguish plaintiff's title to the parcels of land at issue.  Plaintiff claims to have held a continuous interest in the land since the ratification of a treaty between plaintiff and the Delaware tribe in 1848.  Consequently, plaintiff seeks a declaratory judgment that it holds superior title to the lands at issue.  Further, plaintiff seeks monetary damages for trespass by defendants and an order enjoining defendants from further trespass.

## II.  Standard for Motion to Dismiss

The court will dismiss a cause of action for failure to state a claim only when it appears beyond a doubt that the plaintiff can prove no set of facts in support of the theory of recovery that would entitle him or her to relief, *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Maher v. Durango Metals, Inc.*, 144 F.3d 1302, 1304 (10th Cir.1998), or when an issue of law is dispositive. *Neitzke v. Williams*, 490 U.S. 319, 326, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989).  The court accepts as true all well-pleaded facts, as distinguished from conclusory allegations, *Maher*, 144 F.3d at 1304, and all reasonable inferences from those facts are viewed in favor of the plaintiff. *Swanson v. Bixler*, 750 F.2d 810, 813 (10th Cir.1984). The issue in resolving a motion such as this is not whether the plaintiff will ultimately prevail, but whether he or she is entitled to offer evidence to support the claims.

**1.**  By referring to the record title holders as "landowners," the court expresses no judgment as to the ultimate issue of ownership.

**2.**  The court notes that the treaties referenced in this Order spell the name of the Wyandotte Tribe in different ways, such as "Wyandot" and

"Wyandott."  The court, when directly quoting from such documents, will spell "Wyandotte" as it is spelled in the cited document.  Otherwise, the court will spell "Wyandotte" as it is currently accepted.

*Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974), *overruled on other grounds, Davis v. Scherer,* 468 U.S. 183, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984).

The court notes that, in making its ruling on defendants' respective Motions to Dismiss, it has reviewed two treaties between plaintiff and the United States, as well as some public records, including land patents issued by the United States and records from this court that defendants attached to their Motions to Dismiss, even though such documents were not originally attached to plaintiff's complaint. Normally, the court does not look beyond the complaint itself when ruling on a 12(b)(6) motion. *See Dean Witter Reynolds, Inc. v. Howsam,* 261 F.3d 956, 960 (10th Cir.2001). However, "it is accepted practice, if a plaintiff does not incorporate by reference or attach a document to its complaint, but the document is referred to in the complaint and is central to the plaintiff's claim, a defendant may submit an indisputably authentic copy to the court to be considered on a motion to dismiss." *Id.; see also MacArthur v. San Juan County,* 309 F.3d 1216, 1221 (10th Cir.2002).

Plaintiff does not dispute the authenticity of the treaties or the land patents, and plaintiff's claims are indisputably premised on the treaties and the patents that were issued. In this type of situation, the court may consider the documents without converting defendants' Motion to Dismiss into a request for summary judgment under Fed.R.Civ.P. 56. *Id.* Additionally, the court may take judicial notice of its own files and records, and matters of public record in connection with a motion to dismiss without converting the motion to dismiss into one for summary judgment. *Logan v. United States,* 272 F.Supp.2d 1182, 1184 n. 1 (D.Kan.2003). The court therefore takes judicial notice of the treaties, land patents, public records, and court records defendants attached to their Motions to Dismiss.

### III. Defendants' Motion to Dismiss Plaintiff's Corrected Fourth Amended Complaint

#### A. Facts

Plaintiff claims that in 1843 it acquired from the Delaware Tribe, by purchase and gift, 39 sections of land at the confluence of the Missouri and Kansas Rivers in what was then the Territory of Kansas. In 1855, plaintiff and the United States entered into the 1855 treaty.

Article 1 of the 1855 treaty states in pertinent part:

The Wyandott Indians having become sufficiently advanced in civilization, and being desirous of becoming citizens, it is hereby agreed and stipulated, that their organization, and their relations with the United States, as an Indian tribe, shall be dissolved and terminated, on the ratification of this agreement; except so far as the further and temporary continuance of the same may be necessary in the execution of some of the stipulations herein; and from and after the date of such ratification, the said Wyandott Indians, and each and every of them, except as hereinafter provided, shall be deemed, and are hereby declared, to be citizens of the United States, to all intents and purposes; and shall be entitled to all the rights, privileges, and immunities of such citizens; and shall in all respects be subject to the laws of the United States, and of the Territory of Kansas, in the same manner as other citizens of said Territory; and the jurisdiction of the United States and of said Territory, shall be extended over the *Wyandott country,* in the same manner as over other parts of said Territory.

10 Stat. 1159 (emphasis added). Wyandotte Indians who did not want to be subject to the immediate operation of the treaty could apply for temporary exemption from its provisions, upon application to the commissioners provided for in the 1855 treaty.

Article 2 of the 1855 treaty states:

The Wyandott nation hereby cede and relinquish to the United States, all their right, title, and interest in and to the tract of country situate (sic) in the fork of the Missouri and Kansas Rivers, which was purchased by them of the Delaware Indians, by an agreement dated the fourteenth day of December, one thousand eight hun-

dred and forty-three, and sanctioned by a joint resolution of Congress approved July twenty-fifth, one thousand eight hundred and forty-eight, the object of which cession is, that the said lands shall be subdivided, assigned, and reconveyed, by patent, in fee simple, in the manner hereinafter provided for, to the individuals and members of the Wyandott nation, in severalty; except as follows, viz: The portion now enclosed and used as a public burying-ground, shall be permanently reserved and appropriated for that purpose; two acres, to include the church building of the Methodist Episcopal Church South, are hereby reserved, granted, and conveyed to said church. Four acres, at and adjoining the Wyandott ferry, across and near the mouth of the Kansas River, shall also be reserved, and, together with the rights of the Wyandotts in said ferry shall be sold to the highest bidder, among the Wyandott people, and the proceeds of sale paid over to the Wyandotts. On the payment of the purchase-money in full, a good and sufficient title to be secured and conveyed to the purchaser, by patent from the United States.

*Id.* at 1159–60.

Article 3 of the 1855 treaty states in pertinent part: "As soon as practicable after the ratification of this agreement, the United States shall cause the lands ceded in the preceding article, to be surveyed into sections, . . . ." *Id.* at 1160. Article 3 also provided for three commissioners (two representatives of the Wyandottes and one representative of the United States) to divide and distribute the land among the Wyandottes in three classes: "those families the heads of which . . . are sufficiently intelligent, competent and prudent to manage their affairs and interests"; "those families the heads of which are not compe-

tent and proper persons to be entrusted with their shares of money"; and those who were "orphans, idiots or insane." The commissioners were also to "prepare a list of all such persons and families, among the Wyandott people, as may apply to be temporarily exempted from citizenship." *Id.* at 1160–1161. Article 3 further directed the commissioners, upon completion of the division and assignment of the lands, to file a plat and schedule of the allotments, along with the lists of persons, with "the clerk of the county in which the Wyandott lands are situated." *Id.* at 1161.

Article 4 of the 1855 treaty provided that, upon receipt of the allotments referenced in Article 3, the United States would then patent the land, with Wyandottes in the "competent" class receiving patents that contained "an absolute and unconditional grant in fee simple," and "those not so competent" receiving patents of land, but containing certain limitations on alienation.[3] 10 Stat. 1161.

The crux of plaintiff's claims in this case is that certain sections of land identified by section number in its complaint (the gifted sections), alleged to have been given to it by the Delawares in the 1843 transaction, were not transferred from it by the 1855 treaty and therefore remain its property. However, subsequent to the 1855 treaty, the United States granted patents to the lands within the gifted sections. Defendants provided the court with a certified copy of the allotments of land made pursuant to the 1855 treaty as they were originally certified by the Wyandotte County Clerk, and containing certifications and approvals, which include the 1859 approval of the United States Secretary of the Interior. Plaintiff contends that those patents by the United States to the land within the gifted sections, and subsequent transfers by the grantees, are all invalid.

3. Defendants argue that the subsequent history of the removal of these restrictions placed on individual members of the "not so competent" class is not essential to resolution of this motion to dismiss because, they claim, whether individual Wyandotte recipients of land patents pursuant to the 1855 treaty properly reconveyed land that had been patented to them as individuals is not at issue in this case. Defendants point out that, according to Article XV of the subsequent Treaty with the Senecas, & c., Feb. 23, 1867, U.S.-

Seneca Tribe, et al., arts. XIII–XV, 13 Stat. 513, 516–517 (1867 treaty), with various other tribes and "certain Wyandottes," those restrictions on alienation were removed, and a process for confirmation or rejection of sales already made was established, to be administered by the Secretary of the Interior. Subsequently, the Secretary of the Interior filed a report pursuant to the 1867 treaty, a certified copy of which defendants attached to their Motions to Dismiss.

Defendants also provided the court with certified copies of patents [4] from the United States to land within the sections identified as the gifted sections (the patents), as they are recorded in the land records of the Office of the Wyandotte County Register of Deeds. These patents, although recorded in the Office of the Register of Deeds of Wyandotte County at various times from 1861–1904, were all issued by or in the name of President James Buchanan in 1859. The patents each state that they are issued pursuant to the 1855 treaty, reflecting "tracts or parcels of land awarded to the Heads of Families, and to Individuals of the said Tribe" as the result of allotments under the 1855 treaty.

In 1960, the Unified Government (through its predecessor, City of Kansas City, Kansas), the United States, and plaintiff (then described as the "Wyandotte Tribe of Oklahoma") were among the parties to consolidated lawsuits in this court, concerning what plaintiff now describes as the Huron Cemetery Property. These lawsuits (the 1960 lawsuits) were captioned *City of Kansas City, Kansas v. United States, et al.*, No. KC–1279, and *Zane, et al. v. United States*, No. KC–1280.

The parties to the 1960 lawsuits, including the Unified Government and plaintiff, stipulated in writing that, pursuant to the 1855 treaty, land patents were issued to individuals and members of the Wyandotte Nation, in severalty, based on allotments by commissioners, encompassing "all of the Wyandott land in Kansas" except the public burial ground and three other small tracts (the two church properties and a ferry), which were also exempted from Article 2 of the 1855 treaty. Stipulation, 1960 Lawsuits, April 10, 1960.[5]

Plaintiff also claims additional lands adjacent to the gifted sections have been added to the gifted sections by accretion [6] (the accreted lands). Plaintiff claims that title to the accreted lands was wrongly granted to patent holders or their successors of land within the gifted sections, and that plaintiff is the rightful owner of such lands based upon rightful ownership of the gifted sections. Thus, plaintiff's claim to the alleged accreted lands depends on the success of its claim to the alleged gifted sections.

Plaintiff claims that the 1855 treaty also did not transfer the Huron Cemetery Property, and that it is the beneficial owner of that property. Plaintiff pleads that the United States is the actual or record owner of the Huron Cemetery Property, in trust for plaintiff. Plaintiff complains that commercial properties on Seventh Street and Minnesota Avenue encroach upon the Huron Cemetery Property.

In its original complaint in this matter, filed on June 18, 2001, plaintiff joined the United States as "owner of, *inter alia,* parcel 216206, which parcel is within the Gifted Sections." Original Complaint ¶ 40. The court takes notice that property owned by the United States, including the courthouse in which this court sits, as well as the Postal Service property directly to the north of the courthouse, is within the sections identified by plaintiff as the gifted sections.

The United States filed a motion to dismiss on September 10, 2001. On November 1, 2001, plaintiff and the United States voluntarily stipulated to the dismissal of the United States as a defendant, pursuant to Federal Rule of Civil Procedure 41(a)(1). The dismissal was stipulated to be with prejudice as to plaintiff's claims against the United States as record owner of property at issue,

---

**4.** Defendants argue that, given plaintiff's allegation in this case that all the land within the gifted sections was patented by the United States, and plaintiff's stipulation in two 1960 lawsuits in this court that all land of the Wyandottes in Kansas (necessarily including all of the land in dispute) was allotted and patented by the United States to individual Wyandottes, the patents defendant has provided to the court are believed to encompass all of the land in the gifted sections with the exception of the tracts allotted to Carey Rogers (which was the subject of *Schrimpscher v. Stock-*

*ton,* 183 U.S. 290, 22 S.Ct. 107, 46 L.Ed. 203 (1902)), and Mary Curleyhead (referenced as allotment tract 59), copies of patents of which defendants have not yet located.

**5.** Defendants provided the court with a certified copy of the stipulation from court records maintained by the National Archives Center in Kansas City, Missouri.

**6.** Accretion refers to the drying up of the riverbed adjacent to the gifted lands.

but without prejudice as to any other claim. The Unified Government and other defendants did not stipulate to this dismissal. As a result of the stipulated dismissal of the United States as a defendant, the court did not rule on the United States' September 10, 2001, motion to dismiss.

The defendants who have joined in the current motions to dismiss claim first, that plaintiff's complaint should be dismissed in part under Rule 12(b)(6) because certain claims are barred by the Kansas statute of limitations, and second, that plaintiff's complaint should be completely dismissed under Rule 19 for inability to join the United States, which defendants claim is an indispensable party.

### B. Statute of Limitations Under Kansas Law

Defendants claim that the applicable Kansas statute of limitations is dispositive of Count II (Trespass As To The Gifted Sections and Accreted Lands) and Count III (Declaratory Judgment) of plaintiff's complaint. Defendants argue that the gifted sections were included in the "Wyandott country" in the 1855 treaty, that plaintiff waived its sovereignty over the "Wyandott country," and that, therefore, Kansas statute of limitations apply to plaintiff's claims. Plaintiff contends that improperly sold or transferred land is treated as though it was never sold or transferred, and thus it cannot be subject to the rigors of state law defenses or statutes of limitation. Plaintiff thus contends that the gifted sections and accreted lands remain Indian lands, and state law defenses and statutes of limitation cannot be used to support dismissal of the action. As the court has previously noted, plaintiff's claims with regard to the accreted lands depend on their success with regard to the gifted sections.

### 1. Whether the Gifted Sections Were Part of "Wyandott Country"

■ The central issue is whether the claimed gifted sections and subsequent accreted lands, as they are described in plaintiff's complaint, were included in the "Wyandott country" referred to in the 1855 treaty. Plaintiff argues that the allegations in its complaint must be taken as true, and, therefore, the 1855 treaty did not validly cede the gifted and accreted lands because those lands were not included in "Wyandott country" in the 1855 treaty. Plaintiff further contends that any ambiguous language in the 1855 treaty must be construed in favor of Indians.

Defendants raise persuasive arguments that plaintiff cannot credibly argue that the gifted sections were not included in "the Wyandott country" referred to in Article 1 of the 1855 treaty. First, the "Wyandott country" appears to naturally and logically refer to the sovereign territory of the Wyandottes. Second, plaintiff's construction of the 1855 treaty would be nonsensical in the context of Article 1, which refers to and contemplates the total dissolution of the Wyandotte tribe. Third, if the "Wyandott country" phrase does not encompass all of the Wyandotte holdings, why doesn't the 1855 treaty define or mention what parcels are left out, and why doesn't it say anything at all about what is to become of any such property? And fourth, if the Wyandotte tribe was dissolved pursuant to the 1855 treaty, how could it then continue to own or have sovereignty over any land as a non-existent entity?

Defendants point out that the reference to the "Wyandott country" is easily understood in the context of Indian law. "Indian country" is and was at the time of the 1855 treaty a term of art:

As early as July 22, 1790, Congress used the expression "Indian country" in the first trade and intercourse act, apparently with the meaning of country belonging to the Indians, occupied by them, and to which the Government recognized them as to having some kind of right and title. In the Act of March 1, 1793, Indian country and Indian territory were used synonymously. The Act of May 19, 1796 contained the first statutory delimitation of Indian country, fixing, according to the then existing treaties, the boundary line between Indian country and the United States. In this act, as in those which followed it, the term "Indian country" is used as descriptive of the country within the boundary lines of the Indian tribes.

. . . .

Indian country in all these statues is territory, wherever situated, within which tribal law is generally applicable, federal law is applicable only in special cases designated by statute, and state law is not applicable at all.

Felix S. Cohen, *Handbook of Federal Indian Law*, at 6 (1942). The court thus finds that the reference to the "Wyandott country" in the 1855 treaty, understood within the meaning of the phrase "Indian country" in 1855, refers to the territory of the Wyandottes, then existing, within the boundary line of the tribe, or as to which tribal law applied instead of state or territorial law. Therefore, all the land of the Wyandotte tribe, including the gifted sections, was within the "Wyandott country" referred to in the 1855 treaty.

### 2. Waiver of Tribal Sovereignty Under the 1855 Treaty

■ Defendants argue that, in the plain language of the 1855 treaty relied upon by plaintiff, there was clear agreement, approved by Congress, subjecting both the individual members of the Wyandotte Tribe, and the "Wyandott country" to the laws of Kansas. Defendants further contend that, in exchange, the land—including the land at issue in this case—was patented by the United States to individual members of the Wyandotte Tribe, which constituted a clear waiver of tribal sovereignty.

Specifically, the language in Article 1 of the 1855 treaty effectively eliminated the territorial or geographical reach of Wyandotte sovereignty. The jurisdiction of the Territory of Kansas was extended over "the Wyandott country" in the same manner as over other parts of Kansas, without regard to ownership by any particular individual or tribal group. Defendants contend that this meant that, effective January 31, 1855, the date the 1855 treaty was signed, Kansas law replaced Wyandotte sovereignty over the gifted sections.

In *Schrimpscher v. Stockton*, 183 U.S. 290, 22 S.Ct. 107, 46 L.Ed. 203 (1902), heirs of a Wyandotte of the "incompetent class" under the 1855 treaty, who had received one of the 1859 land patents under Article 4 of the 1855 treaty, sought to recover the property from a third party to whom the "incompetent" Wyandotte had sold in 1864, claiming that the transfer was in violation of then-existing restrictions on alienation by incompetents. *Id.* at 292–93, 22 S.Ct. 107. The heirs brought an action of ejectment in 1894, and defendants raised as a defense the three and fifteen year statutes of limitation under Kansas law. *Id.* at 296, 22 S.Ct. 107.

The Kansas Supreme Court agreed with the heirs that the deed given to defendants' predecessor by their "incompetent" predecessor was absolutely void because it was given during a period in which the incompetent lacked authority to make a valid conveyance. However, the Kansas Supreme Court affirmed the lower court's judgment in favor of defendants, relying on applicable Kansas statutes of limitations. *Schrimpcher v. Stockton*, 58 Kan. 758, 761–63, 51 P. 276 (1897). The Kansas Supreme Court held that the land at issue was allotted to Wyandotte Indians and became taxable in accordance with the 1855 treaty. The Kansas Supreme Court further held that the subsequent 1867 treaty had, by its terms, removed restrictions on alienation of land that had been patented to incompetents under the 1855 treaty, and thus, the land, even if conveyed originally by void deed, became subject to transfer by adverse possession at and after that time. *Id.* at 762, 51 P. 276. "The lands thereafter had no different legal status from those patented to white persons." *Id.*

In the United States Supreme Court appeal of *Schrimpscher*, the heirs argued that the state statute of limitations could not apply to Indians. 183 U.S. at 296, 22 S.Ct. 107. In its decision, the Supreme Court, assumed that, so long as Indians maintain tribal relations, they are not subject to limitations prescribed by state statutes. However, the Supreme Court held that Indians "would lose this immunity when their relations with their tribe were dissolved by accepting allotments of lands in severalty." *Id.* The Supreme Court cited Article 1 of the 1855 treaty as such an event, holding that after the removal of the restraints on alienation, the Indian's heirs "were chargeable with the same diligence in beginning an action for their recov-

ery as other persons having title to lands."
*Id.*[7]

*Schrimpscher* stands for the proposition that, subsequent to the 1855 treaty, Kansas territorial and state law applied to the property at issue because of the acceptance by individual Wyandottes of land allocations under Article 1, except as limitations may have been tolled for "incompetent" Wyandottes between the time of the 1855 treaty and the 1867 treaty, which constituted a waiver of the Wyandottes' sovereignty over the land. Thus, under *Schrimpscher,* for all Wyandottes who were not "incompetent" under the 1855 treaty, Kansas law began to apply to them in 1855. For members of the "incompetent" class, Kansas law began to apply to them in 1867, when the restraints on alienation were removed.

### 3. Kansas Law Applies to the Gifted Sections

Having determined 1) that the phrase "Wyandott country" in the 1855 treaty included the gifted sections, and 2) that the language of the 1855 treaty, combined with the United States' issuance of patents to the "Wyandott country" (including the gifted sections) constituted a waiver of the Wyandottes' sovereign immunity over the land, the court finds that the logical and clear meaning of Article 1 of the 1855 treaty is that, effective with the ratification of the 1855 treaty, all of the Wyandottes (except those individuals who might thereafter apply for continued temporary protection of federal authorities)[8] as persons became subject to Kansas and United States law. As a result, Kansas law applied to all of the Wyandotte country, including the gifted sections, once the 1855 treaty was ratified. As the court discussed above, the Kansas Supreme Court and the United States Supreme Court confirmed this interpretation more than a hundred years ago in *Schrimpscher.*

In a later case, *South Carolina v. Catawba Indian Tribe, Inc.,* 476 U.S. 498, 106 S.Ct. 2039, 90 L.Ed.2d 490 (1986), the United States Supreme Court again considered a similar issue, and held that state statutes of limitation applied to claims of an Indian tribe concerning land in South Carolina once the reservation land assets of the tribe had been allocated among individual members pursuant to federal legislation that also made tribal members subject to state law. Like plaintiff in this case, the Catawba tribe claimed the land at issue pursuant to a prior treaty with the United States. *Id.* at 500, 106 S.Ct. 2039. However, with that tribe's support, Congress had enacted legislation in the 1950's allotting other then-current reservation land to individual tribal members, and stating that "the laws of the several States shall apply to them in the same manner they apply to other persons or citizens within their jurisdiction." *Id.* at 505, 106 S.Ct. 2039.

Notably, the Catawba tribe argued that this provision was ambiguous, and that treaties must be construed in favor of Indians. *Id.* at 506–07, 106 S.Ct. 2039. The Supreme Court held that the canons of construction in favor of Indians cannot be used to permit reliance on ambiguities that do not exist, or to disregard the clear intent of Congress. The Supreme Court noted that "even though 'legal ambiguities are resolved to the benefit of the Indians,' courts cannot ignore plain language that, viewed in historical context and given a 'fair appraisal,' clearly runs counter to a tribe's later claims." *Id.* at 507 & n. 16, 106 S.Ct. 2039 (citing *Oregon Dep't of Fish and Wildlife v. Klamath Indian Tribe,* 473 U.S. 753, 774, 105 S.Ct. 3420, 87 L.Ed.2d 542 (1985) (internal citations omitted)). The Supreme Court also cited *Rice v. Rehner,* 463 U.S. 713, 732, 103 S.Ct. 3291, 77 L.Ed.2d 961 (1983), for the holding that the canon of construction regarding certain Indian claims

**7.** The Supreme Court noted the language in the subsequent 1867 treaty that "a portion of the Wyandottes ... [who] although taking lands in severalty, have sold said lands, and are still poor" to set aside certain other lands ("ceded by the Senecas") for them to "begin anew a tribal existence," but declined to address the effect on certain Wyandottes reconstituting "anew" a tribe as a result of the 1867 treaty because there was

no factual proof by the plaintiff heirs in *Schrimpscher* that they ever elected to both resume tribal relations and themselves become members of the incompetent class. *Id.* at 297, 22 S.Ct. 107.

**8.** The treatment of that group of Wyandottes does not appear to be an issue in this case.

should not be applied "when application would be tantamount to a formalistic disregard of congressional intent," and *DeCoteau v. District County Court,* 420 U.S. 425, 447, 95 S.Ct. 1082, 43 L.Ed.2d 300 (1975), for the holding that "[a] canon of construction is not a license to disregard clear expressions of tribal and congressional intent." *Id.*

The Supreme Court, in affirming summary judgment against the Catawba Tribe, held that:

> Without special federal protection for the Tribe, the state statute of limitations should apply to its claim in this case. For it is well established that federal claims are subject to state statutes of limitations unless there is a federal statute of limitations or a conflict with federal policy. Although federal policy may preclude the ordinary applicability of a state statute of limitations for this type of action in the absence of a specific congressional enactment to the contrary, the Catawba Act clearly suffices to reestablish the usual principle regarding the applicability of the state statute of limitations. In striking contrast to the situation in *County of Oneida,* the Catawba Act represents an explicit redefinition of the relationship between the Federal Government and the Catawbas; an intentional termination of the special federal protection for the Tribe and its members; and a plain statement that state law applies to the Catawbas as to all "other persons or citizens."

*Id.* at 507–08, 106 S.Ct. 2039 (internal citations omitted).

The Supreme Court further noted that when congressional action removes restraints on alienation by Indians, state law becomes applicable to subsequent claims:

> That the state statute of limitations applies as a consequence of terminating special federal protections is also supported by the significance we have accorded congressional action redefining the federal relationship with particular Indians. We have long recognized that, when Congress removes restraints on alienation by Indians, state laws are fully applicable to subsequent claims .... These principles reflect an understanding that congressional action to remove restraints on alienation and other federal protections represents a fundamental change in federal policy with respect to the Indians who are the subject of the particular legislation.

*Id.* at 508–09, 106 S.Ct. 2039 (citing, among other similar cases, *Schrimpscher,* 183 U.S. at 296, 22 S.Ct. 107, in support of its holding).

■ This court believes that the Supreme Court's holdings in both the *Schrimpscher* and *Catawba* cases directly address Counts II and III of plaintiff's complaint. The court finds that, given the clear language in Article 1 of the 1855 treaty making state and federal law applicable not only to the individual Wyandottes, but also to the "Wyandott country" as a whole within the Territory of Kansas, that once the lands were allotted to individual Wyandottes and restraints on alienation removed, Kansas law applies to subsequent claims regarding the lands at issue in this case.

### 4. Effect of Kansas Law on Plaintiff's Claims

■ Applying these principles, Kansas law began to apply to any challenges to the land patents to the gifted sections no later than their issuance in 1859 to Wyandottes who were members of the competent class, and no later than 1867 to members of the incompetent class. The patents now challenged by plaintiff were issued 142 years before this suit was filed. At that time during the territorial period, and when Kansas later became a state in 1861, Kansas law provided a two-year statute of limitations for trespass claims and a 21–year–period in which to institute claims for the recovery of real property. General Laws of 1862, Title II, ch. 2, § 16, and ch. 3, § 22. Upon and for the material period subsequent to the enactment of the Kansas Code of Civil Procedure in 1868, actions for trespass to real property could only be brought within two years. G.S. 1868, ch. 80, § 18 (Oct. 31, 1868). Actions "for the recovery of real property, or for the determination of any adverse right or interest therein" could only be brought within 15 years. *Id.* § 16. Those limitation periods expired long before this action was brought. Accord-

ingly, Counts II and III of plaintiff's complaint are time-barred under Kansas law.

### C. Rule 19

As an alternative to its statute of limitations arguments, defendants claim that plaintiff's claims should be dismissed in their entirety because of plaintiff's failure and inability to join the United States as a party under Federal Rule of Civil Procedure 19. Plaintiff claims that the court settled this issue in its Order dated May 3, 2002, which held that the United States is not an indispensable party to this lawsuit under Rule 19, and that defendants are collaterally estopped from raising the Rule 19 issue again. *See Wyandotte Nation v. City of Kan. City, Kan.,* 200 F.Supp.2d 1279, 1294–99 (D.Kan. 2002). Plaintiff further notes that no party filed a motion to reconsider the findings in the court's May 3, 2002, Order with regard to the United States' indispensability, and that the ruling stands as the "law of the case."

■ While the court acknowledges that it has previously issued a ruling on the Rule 19 indispensability of the United States, the court first notes that the issue of indispensability is one that can be raised at any time, and which the court has an independent duty to raise *sua sponte.* *See Thunder Basin Coal Co. v. S.W. Pub. Serv. Co.,* 104 F.3d 1205, 1211 (10th Cir.1997). Moreover, the indispensable party issue is not one that a party can waive. *See Enter. Mgmt. Consultants, Inc. v. United States,* 883 F.2d 890, 892–93 (10th Cir.1989); *see also Provident Tradesmens Bank & Trust Co. v. Patterson,* 390 U.S. 102, 111, 88 S.Ct. 733, 19 L.Ed.2d 936 (1968). Thus, the current defendants' failure to raise the issue in conjunction with the previous briefing in this case is not fatal to defendants' current argument that the United States is an indispensable party.

Second, the court finds plaintiff's collateral estoppel argument unpersuasive, as collateral estoppel requires a valid and final judgment on an issue of ultimate fact that precludes a party from litigating the same issue in a different lawsuit. *See Ashe v. Swenson,* 397 U.S. 436, 444–46 & 445 n. 10, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970); *see also SIL–FLO,*

*Inc. v. SFHC, Inc.,* 917 F.2d 1507, 1520 (10th Cir.1990). The court has not issued a final judgment in this case; moreover, the Rule 19 issue is not being raised in a separate lawsuit. Defendants raised the Rule 19 issue in their respective, timely motions to dismiss. Therefore, defendants' argument that the United States is an indispensable party in the current motions to dismiss is properly before this court.

Third, while the court acknowledges plaintiff's argument that the "law of the case" doctrine is designed to prevent parties from raising the same issue in separate motions, which can prevent the economical and quick determination of issues, the court notes that the "law of the case" rule "unlike res judicata ... is not an 'inexorable command,' but is to be applied with good sense." *Major v. Benton,* 647 F.2d 110, 112 (10th Cir.1981) (citing *White v. Murtha,* 377 F.2d 428, 431–32 (5th Cir.1967)). The court made its original ruling on the Rule 19 issue two years ago, at an early stage of the case. The court now takes up the issue at a later point in the case, when numerous additional defendants have been identified, a new scheduling order has been entered, and with the benefit of more fully developed briefing by the parties. This court will not blindly rely on a ruling that was made before the court was fully aware of the facts and issues. *See Lindsey v. Dayton–Hudson Corp.,* 592 F.2d 1118, 1121 (10th Cir.1979) (holding that "until final decree the court always retains jurisdiction to modify or rescind a prior interlocutory order. Although the court might properly refuse to consider a second motion, we will not require a judge to perpetuate error or take a more roundabout way to arrive at an ultimately necessary judgment by refusing him the right to entertain a second motion ... after he has ruled once the other way.") (internal citations omitted).

For all the reasons set forth above, the court will consider defendants' current arguments for dismissal under Rule 19.

#### 1. Suit Against the United States

■ In previously examining the Rule 19 factors regarding the issue of indispensability

of the United States as a party, the court distinguished this case from the Tenth Circuit case, *Navajo Tribe of Indians v. New Mexico*, 809 F.2d 1455, 1471 (10th Cir.1987), noting that "[t]his is not a situation in which the United States has never been a party to the lawsuit, or in which the tribe cannot proceed against the United States due to a statute of limitations or a similar jurisdictional barrier. Rather, the United States initially was a party to the suit and agreed to be dismissed." *Wyandotte Nation*, 200 F.Supp.2d at 1295-96. This court then continued with its analysis of the Rule 19 factors on the premise that the United States had agreed to a voluntary dismissal of plaintiff's claims against it, thus resolving any claims plaintiff might have against it with regard to the gifted sections and accreted lands at issue in this lawsuit. In doing so, this court concluded that "it is possible to accord complete relief to the existing parties in the absence of the United States." *Id.*

However, because plaintiff voluntarily dismissed its claim against the United States, the court made this ruling without actually examining whether, in fact, plaintiff could proceed against the United States, or whether a statute of limitations or other jurisdictional barrier might bar plaintiff's claims. The court now believes that an analysis of whether plaintiff could have proceeded with its claims against the United States is necessary in order to make a determination with regard to the United States' indispensability in the lawsuit against the remaining defendants.

### a. Scope of the Indian Claims Commission Act

Defendants argue that, as in the *Navajo Tribe* case, plaintiff's claims against the United States are time barred by the Indian Claims Commission Act (ICCA).[9] The ICCA created a quasi-judicial body, the Indian Claims Commission (ICC) to hear and determine all tribal claims against the United States that accrued before August 13, 1946. Claims that accrued before August 13, 1946, but were not filed with the ICC by August 13, 1951, "could not 'thereafter be submitted to any court or administrative agency for consideration,' nor could such a claim 'thereafter be entertained by the Congress.'" *Navajo Tribe*, 809 F.2d at 1460-61 (quoting ICCA § 12, 25 U.S.C. § 70k (1976)). ICCA authorized the ICC to hear five types of claims:

1) Claims in law or equity arising under the Constitution, laws, treaties of the United States, and Executive orders of the President; 2) all other claims in law or equity, including those sounding in tort, with respect to which the claimant would have been entitled to sue in a court of the United States if the United States was subject to suit; 3) claims which would result if the treaties, contracts, and agreements between the claimant and the United States were revised on the ground of fraud, duress, unconscionable consideration, mutual or unilateral mistake, whether of law or fact, or any other ground cognizable by a court of equity; 4) claims arising from the taking by the United States, whether as the result of a treaty of cession or otherwise, of lands owned or occupied by the claimant without the payment for such lands of compensation agreed to by the claimant; and 5) claims based upon fair and honorable dealings that are not recognized by any existing rule of law or equity.

ICCA § 2, 25 U.S.C. § 70a (1976). The ICC limited relief for valid claims under the ICCA to monetary compensation. *Osage Nation of Indians v. United States*, 1 Ind. Cl. Comm. 54, 65 (1948); *The Western Shoshone Legal Defense & Educ. Ass'n v. United States*, 35 Ind. Cl. Comm. 457, 476 (1975). Relief under the ICCA did not include return of disputed lands to Indian tribes. *Navajo Tribe*, 809 F.2d at 1461, 1467.[10]

9. The ICCA was enacted on August 13, 1946, and formerly was codified as amended at 25 U.S.C. §§ 70 to 70v-2 (1976) but is omitted from the current United States Code because the Indian Claims Commission terminated on September 30, 1978. The Tenth Circuit, in *Navajo Tribe*, 809 F.2d 1455 (10th Cir.1987), set forth an ex-

tensive and thorough history of the ICCA, which it is not necessary to repeat herein.

10. The Tenth Circuit noted that in doing so, Congress made a "fundamental policy choice" "out of the sheer, pragmatic necessity that, al-

### b. Effect of the Indian Claims Commission Act on Plaintiff's Claims

In this case, plaintiff alleges that the United States wrongfully issued patents for the gifted sections pursuant to the 1855 treaty. Plaintiff claims that because it never ceded or otherwise relinquished title to the gifted sections, the patents that the United States granted, which resulted in subsequent granting of titles to the accreted lands, are all invalid. Plaintiff seeks a declaratory judgment quieting title to the gifted sections and the accreted lands, as well as monetary damages for trespass by defendants and an order enjoining defendants from further trespass on the gifted sections and accreted lands.[11] The court believes that such claims, when made against the United States, are precisely the type of claims that were intended to be addressed by the ICCA.[12]

Based on plaintiff's claims, plaintiff knew or should have known of its claims against the United States as a result of the allegedly wrongfully issued patents in 1855. At the latest, plaintiff knew or should have known of its claims against the United States by 1867, when plaintiff signed the 1867 treaty with the United States which removed the restrictions on alienation to land that had been patented to incompetents under the 1855 treaty. Certainly, plaintiff was aware of such claims prior to August 1946, when the ICC was formed, and in August 1951, when the five-year statute of limitations under the ICCA expired. Plaintiff cannot, in good faith, assert that it was not aware that the United States had issued patents inconsistent with its title to the disputed lands prior to 1946, or that no claim against the United States arose before it decided to bring this lawsuit in 2001. *See Navajo Tribe*, 809 F.2d at 1470–71. As a result, plaintiff would be barred from pursuing such claims against the United States in this court, or in any other forum.[13] ICCA § 12, 25 U.S.C. § 70k (1976); *see also Navajo Tribe*, 809 F.2d at 1471. "By sleeping on its claim, the Tribe simply lost its forum to litigate the pre–1946 actions of the Government that were inconsistent with its alleged title." *Id.* at 1470.

### 2. Suit Against the Other Defendants

Having concluded that plaintiff could not have maintained its claims against the United States, the court now returns to its examination of defendants' argument that the United

---

though any and all accrued claims could be heard before the Commission, land title in 1946 could not be disturbed because of the sorry injustices suffered by native Americans in the eighteenth, nineteenth, and early twentieth centuries. Those injustices would have to be recompensed through monetary awards." *Id.* at 1467.

11. The court's understanding is that plaintiff is not in possession of any of the lands at issue in this case. The court notes that, although plaintiff characterizes its action as one to quiet title in the gifted sections and the accreted lands, such an action cannot lie when plaintiff is not currently in possession of the lands at issue. *Navajo Tribe*, 809 F.2d at 1462, n. 15 (citing *Whitehead v. Shattuck*, 138 U.S. 146, 11 S.Ct. 276, 34 L.Ed. 873 (1891)). Moreover, the only statute under which plaintiff could bring a quiet title action against the United States is the Quiet Title Act of 1972, 28 U.S.C. § 2409a (1982). *Id.* at 1468; *see also Block v. N.D.*, 461 U.S. 273, 103 S.Ct. 1811, 75 L.Ed.2d 840 (1983).

12. Plaintiff may argue that its claims are not encompassed within the ICCA because plaintiff maintains that its title to the gifted sections was never extinguished. However, the Tenth Circuit dealt with a similar claim in the *Navajo Tribe* case, and found that plaintiff's claims were covered by the ICCA. *See* 809 F.2d at 1464–68.

13. The court also believes that, if plaintiff and the United States had not entered into a voluntary dismissal of the claims against it, the United States would have claimed that plaintiff could not maintain its suit in this court against the United States because of statute of limitations barriers to the United States' waiver of sovereign immunity under the ICCA and the QTA. *See* United States' Motion to Dismiss (Doc. 9), filed September 10, 2001, but never ruled on by the court due to plaintiff's voluntary dismissal of the United States as a defendant in the case on November 1, 2001.

The court finds that plaintiff's claims against the United States would also be time-barred by the QTA, which completely foreclosed any suit on claims that accrued more than twelve years before the 1972 effective date of the QTA. 28 U.S.C. § 2409a(g); *Block*, 461 U.S. at 286 n. 23, 103 S.Ct. 1811. As the court previously noted with regard to the statute of limitations under the ICCA, plaintiff knew or should have known of its claims against the United States as a result of the allegedly wrongfully issued patents pursuant to the 1855 treaty, and, at the latest, in 1867. *See also Navajo Tribe*, 809 F.2d at 1468–69.

States is an indispensable party under Rule 19 who cannot be joined in the suit.

### a. Rule 19(a)

As the court previously set forth in its May 2002 Order, Rule 19(a)(1) requires the court to examine whether complete relief can be accorded to the persons already parties in the absence of the United States.[14] To determine whether complete relief can be awarded, the court must consider the type of relief sought by the parties who remain in the lawsuit. Further, the court also must determine whether it may adjudicate the validity of the transfers of title issued by the United States to the defendants or their predecessors in the absence of the United States. If the court determines that complete relief cannot be awarded in the absence of the United States, then the United States becomes a "necessary" party under Rule 19(a), and the court must then determine whether the United States is an indispensable party who cannot be joined under Rule 19(b).

Without analyzing whether plaintiff could have maintained its claims against the United States, the court previously determined that it could, in fact, adjudicate the validity of land patents issued by the United States in the absence of the United States, and contemplated the possible return of the gifted sections and accreted lands to Indian trust status if plaintiff should prevail. However, in light of the court's finding that plaintiff's claims would be time-barred against the United States, and that if plaintiff's claims had not been time-barred, its only remedy against the United States as the original grantor of the patents would be monetary damages, the court finds that adjudication of the land rights conveyed by the United States would not be proper in the United States's absence. In fact, the court believes the Tenth Circuit's analysis of the Rule 19 issue in *Navajo Tribe* is dispositive of plaintiff's claims against the remaining defendants in this case. As in *Navajo Tribe*, 1) the claims against the remaining defendants in this case rest on documents of title or possession originally derived from the United States; 2) plaintiff seeks to cancel all such patents that led to such title or possession; 3) the Tenth Circuit has affirmed that "all parties to an instrument must be present, else it may not be canceled"; and 4) that "validity of a deed or patent issued by the Federal Government cannot be questioned in suit by a third party against the grantee." 809 F.2d at 1472. Additionally, "a tribe may not avoid the exclusivity bar of § 70k of the Indian Claims Commission Act by seeking title, possession and damages from successors in interest of the United States, where suit against the federal government is barred." *Id.* at 1472 (citing *Oglala Sioux Tribe v. Homestake Mining Co.*, 722 F.2d 1407 (8th Cir.1983)). As a result, the court concludes that it is not possible to accord complete relief to the existing parties in the absence of the United States; moreover, because plaintiff's claims against the United States are time-barred, the United States cannot be joined to the lawsuit. Accordingly, the court finds that the United States is a necessary party under Rule 19(a).

### b. Rule 19(b)

Because the court finds the United States to be a necessary party under Rule 19(a), but one that cannot be joined, the court now turns to the determination of "whether in equity and good conscience the action should proceed among the parties before it, or should be dismissed, the absent person being thus regarded as indispensable." Fed. R.Civ.P. 19(b). The court examines the factors to be considered under Rule 19(b), but notes that Rule 19(b) does not state how much weight each factor should be given. *Id.; Navajo Tribe*, 809 F.2d at 1473. Courts "must determine the importance of each factor on the facts of each particular case and in light of equitable considerations." *Id.* (citing *Glenny v. Am. Metal Climax, Inc.*, 494 F.2d 651, 653 (10th Cir.1974)).

Regarding the first factor, whether a judgment rendered in the absence of the United States would prejudice either the United States or existing parties, the court previously found that because the United States had

---

**14.** The court, in its May 5, 2002, Order, set forth in detail the Rule 19 factors.

agreed to voluntary dismissal of the claims against it and is no longer a party to the suit, the United States would not be prejudiced by any judgment rendered.[15] The court did not consider whether a judgment rendered in the absence of the United States would prejudice existing parties. In light of the court's finding that plaintiff's claims, properly raised under the ICCA, would have resulted in monetary damages to plaintiff and not return of the claimed lands, the court believes the remaining defendants would be severely prejudiced if the court were to render a judgment in plaintiff's favor in the absence of the United States. Instead of relying on the United States to defend plaintiff's claims and to pay any potential damages, the remaining defendants could potentially lose the land to which they claim title and face the prospect of having to pay monetary damages.

Regarding the second Rule 19(b) factor, whether the court could fashion a remedy to reduce the risk of prejudice, the court does not believe it could do so. Whether the United States properly issued the patents and granted title to the claimed lands pursuant to the 1855 treaty "must be decided entirely or not at all." *Navajo Tribe*, 809 F.2d at 1472.

The third Rule 19(b) factor requires the court to consider whether a judgment rendered in the absence of the United States would be adequate. While the court believes a judgment rendered in the United States' absence could be adequate with regard to the current defendants, the court also believes the prejudice to the existing parties under the other factors to be so great that this factor holds little weight.

Finally, the court again considers the fourth Rule 19(b) factor: the availability of an alternative remedy. As the court noted in its May 5, 2002, Order, an alternative remedy likely does not exist for plaintiff in this case.

However, the court finds that this factor, in light of the severe prejudice to the remaining defendants in the absence of the United States, is not dispositive of this issue. To allow plaintiff to proceed, in the absence of the United States, against the third party defendants who gained their title to the disputed lands through an act of the United States, would completely defeat the purpose of the ICCA and allow plaintiff to circumvent the ICC's consistent holding that Indian tribes making claims such as plaintiff's were limited to monetary damages from the United States. Moreover, allowing plaintiff to do so would directly contradict Tenth Circuit precedent set forth in *Navajo Tribe*.

For all of those reasons, the court cannot in equity and good conscience permit plaintiff to prosecute its claims against the remaining defendants, when the underlying claim—title to the gifted sections and accreted lands—should have been brought against the United States many years ago, and for which plaintiff would have received only monetary damages if the ICC had found in its favor. Plaintiff has slept on its claims against the United States and therefore is barred from bringing its claims against private, third party landowners who had no role in the original issuance of the patents to the gifted sections. Because the court finds that the United States is a necessary and indispensable party who cannot be joined under Rule 19, and the court cannot in equity and good conscience permit plaintiff to proceed with its claims, the court hereby dismisses plaintiff's complaint against all of the current defendants.

In doing so, the court acknowledges that the current motions to dismiss were not joined by all of the current defendants. However, the court believes dismissal of plaintiff's complaint against the defendants who joined in the current motions to dismiss,

---

**15.** The court further found that the United States does not claim an interest that is adversarial to plaintiff's. Technically, this is true, since the United States is no longer a party to this suit. However, had the United States remained a party, the court believes that the United States' claimed interest would be completely adverse to plaintiff's. Plaintiff challenges the very patents issued by the United States pursuant to the 1855 treaty. Were plaintiff's claims properly brought under the ICCA, plaintiff and the United States would have been litigating the validity of those patents and plaintiff would have been entitled only to monetary damages from the United States. Moreover, as the court previously noted in its analysis of plaintiff's claims against the United States, the court has every reason to believe the United States would have vigorously opposed plaintiff's claims had it not been dismissed as a party.

as well as all of the remaining defendants, is proper because the court does not believe plaintiff could prevail on the facts as alleged in its complaint, and allowing it the opportunity to amend its complaint would be futile. *See McKinney v. State of Okla., Dep't of Human Servs., Shawnee, Okla.,* 925 F.2d 363, 365 (10th Cir.1991) (upholding *sua sponte* dismissal of a claim where the claimant cannot possibly win relief).

**IT IS THEREFORE ORDERED** that defendants' pending Motions to Dismiss (Docs. 463, 465, 466, 467, 468, 469, 470, 471, 473, and 481) are granted.

**IT IS FURTHER ORDERED** that this case be and is hereby dismissed.