**WYANDOTTE NATION, Plaintiff,**

v.

**Kathleen SEBELIUS, In Her Official Capacity as Governor of the State of Kansas, et al., Defendants.**

**No. 04–2140–JAR.**

United States District Court,
D. Kansas.

Oct. 6, 2004.

See also 99 Fed.Appx. 836.

---

Conly John Schulte, Shilee Therkelsen Mullin, Monteau & Peebles, LLP, Omaha, NE, Sam L. Colville, Holman Hansen & Colville, PC, Kansas City, MO, for Plaintiff.

Edward Passarelli, U.S. Department of Justice, Washington, DC, Jackie A. Rapstine, Office of United States Attorney, William Scott Hesse, Harry Kennedy, David W. Davies, Steven D. Alexander, Stephen O. Phillips, Office of Attorney General, Topeka, KS, Mark D. Hinderks, Stinson Morrison Hecker LLP, Overland Park, KS, for Defendants.

## MEMORANDUM ORDER AND OPINION GRANTING MOTION FOR PRELIMINARY INJUNCTION

ROBINSON, District Judge.

This matter comes before the Court on plaintiff Wyandotte Nation's Motion for a Preliminary Injunction (Doc. 98). Defendants have responded and on July 19, 2004, the Court heard oral arguments on plaintiff's motion as well as several discovery-related motions (Docs. 107, 113, 115 and 116). The parties subsequently filed motions to supplement authority in support and in opposition to plaintiff's motion (Docs.131, 136, 137); and Defendants Marinovich and Miller filed a Motion to Dismiss (Doc. 134) per the Stipulation filed at the hearing. The Court has carefully reviewed the parties' written and oral arguments and is now prepared to rule.

### I. Factual History and Procedural Posture

#### A. The Parties

Plaintiff is the Wyandotte Nation, hereinafter "the Tribe." The "Federal Defendants" collectively refers to the National Indian Gaming Commission ("NIGC"), the United States Attorney for the District of Kansas, United States Attorney John Ashcroft and the United States Department of Justice. Per an order of this Court dated June 1, 2004, the Federal Defendants were dismissed without prejudice. The "State Defendants" collectively refers to Kathleen Sebelius, the Governor of Kansas; William Seck, Superintendent of the Kansas State Highway Patrol; Larry Welch, Director of the Kansas Bureau of Investigation; and Phill Kline, Attorney General of the State of Kansas. The "Municipal Defendants" collectively refers to Carol Marinovich,

City of Kansas City, Kansas Mayor and Ronald Miller, City of Kansas City, Kansas Chief of Police.

### B. Federal law regarding Tribal gaming

Knowledge of the underlying federal law is necessary to understand the factual posture of this case. In *California v. Cabazon*,[1] the United States Supreme Court held that state law may only be applied to tribal lands "if Congress has expressly so provided." The Court held that because Congress had not provided for the regulation of tribal gaming, a state could only prohibit gaming on tribal lands if the state completely prohibited all gaming within its borders.

In response to *Cabazon*, Congress passed the Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C. § 2701 *et seq.*, which divides gaming activities into three classes. Class I gaming consists of "social games solely for prizes of minimal value or traditional forms of Indian gaming engaged in by individuals as a part of, or in connection with, tribal ceremonies or celebrations."[2] Such gaming falls "within the exclusive jurisdiction of the Indian tribes[.]"[3] Class II gaming includes bingo and card games (but not banking card games) that are played in conformance with state laws and regulations regarding hours of operation and limitations on wagers or pot sizes.[4] Such gaming falls "within the jurisdiction of the Indian tribes," but also remains subject to federal oversight as established by the chapter.[5] Class III gaming includes all other forms of gambling, including casino gaming.[6] Under IGRA, tribes may engage in Class III gaming only pursuant to a tribal-state compact that is approved by the Secretary of the Interior.[7] This compact is the mechanism whereby a State, by agreement with the tribe, might assume either civil and/or criminal jurisdiction, and apply its laws or regulations over Indian country.[8]

The IGRA's penal provision, 18 U.S.C. § 1166, incorporates state laws as the federal law governing all nonconforming gambling in Indian country. Section 1166(a) makes "all State laws pertaining to the licensing, regulation or prohibition of gambling, including but not limited to the criminal sanctions applicable thereto" enforceable in Indian country.[9] Under the IGRA, the power to enforce these incorporated state laws rests solely with the United States: "The United States shall have *exclusive* jurisdiction over criminal prosecutions of violations of State gambling laws that are made applicable under this section to Indian country . . . ."[10]

 It is also important to understand the state's limited role under federal law generally, and the IGRA specifically. Since at least 1832, the United States Supreme Court has recognized tribal sovereignty.[11] This tribal sovereignty is limited

---

1. 480 U.S. 202, 207, 107 S.Ct. 1083, 94 L.Ed.2d 244 (1987).

2. 25 U.S.C. § 2703(6).

3. 25 U.S.C. § 2710(a)(1).

4. 25 U.S.C. § 2703(7).

5. 25 U.S.C. § 2710(a)(2).

6. 25 U.S.C. § 2703(8).

7. 25 U.S.C. § 2710(d)(1).

8. 25 U.S.C. § 2710(d)(3)(C); *United Keetoowah Band of Cherokee Indians v. State of Okl ex rel. Moss*, 927 F.2d 1170, 1177 (10th Cir. 1991).

9. 18 U.S.C. § 1166(a).

10. *Id.* at § 1166(d) (emphasis added).

11. *See Worcester v. State of Georgia*, 31 U.S. 515, 557, 6 Pet. 515, 8 L.Ed. 483 (1832) (tribes were "distinct political communities, having territorial boundaries, within which their authority is exclusive, and having a right

only by Congress.[12] Similarly, only the federal government or the tribes themselves can subject the tribes to suit; tribal immunity "is not subject to diminution by the States."[13] Through the IGRA, Congress has permitted the states to negotiate with the tribes through the compacting process to shape the terms under which tribal gaming is conducted. The states have no authority to regulate tribal gaming under the IGRA unless the tribe specifically consents to the regulation in a compact.[14]

■ Although the IGRA provides that Class III gaming activities are only lawful if conducted in conformance with a tribal-state compact,[15] it does not follow that the states have any authority to regulate Class III gaming in the absence of a compact. States may not enforce the terms of IGRA-the only enforcement provided for in the IGRA is through the federal government. The IGRA provides that civil enforcement lies only with the tribes themselves or with the National Indian Gaming Commission (NIGC), which was created by IGRA.[16] Criminal enforcement is left solely to the federal government under 18 U.S.C. § 1166(d).[17] The bottom line is, although it may be "unlawful" for a tribe to engage in Class III gaming absent a compact, the state is powerless to regulate or prohibit such gaming.

### C. Applicable provisions of IGRA and NIGC Regulations

An Indian tribe may engage in gaming under the IGRA only on "Indian lands" that are within such tribe's jurisdiction.[18] Additionally, if the proposed lands are trust or restricted lands, rather than land within the limits of an Indian reservation, the tribe may conduct gaming only if it exercises "governmental power" over those lands.[19]

IGRA defines "Indian lands" as:

(A) all lands within the limits of any Indian reservation; and

(B) any lands title to which is either held in trust by the United States for the benefit of any Indian tribe or individual or held by any Indian tribe or individual subject to restriction by the United States against alienation and over which an Indian tribe exercises governmental power.[20]

■ NIGC regulations further clarify the definition of Indian lands:

Indian lands means:

(a) Land within the limits of an Indian reservation; or

(b) Land over which an Indian tribe exercises governmental power and that is either-

---

to all the lands within those boundaries, which is not only acknowledged, but guarantied by the United States.").

**12.** *See United States v. Wheeler*, 435 U.S. 313, 323, 98 S.Ct. 1079, 55 L.Ed.2d 303 (1978) ("The sovereignty that the Indian tribes retain is of a unique and limited character. It exists only at the sufferance of Congress and is subject to complete defeasance.").

**13.** *Kiowa Tribe of Oklahoma v. Mfg. Technologies, Inc.*, 523 U.S. 751, 754, 118 S.Ct. 1700, 140 L.Ed.2d 981 (1998).

**14.** *United Keetoowah Band*, 927 F.2d at 1177.

**15.** 25 U.S.C. § 2710(d)(1)(C).

**16.** 25 U.S.C. § 2714.

**17.** *See also Gaming Corp. of America v. Dorsey & Whitney*, 88 F.3d 536, 545 (8th Cir.1996) ("Every reference to court action in JGRA specifies federal court jurisdiction.... State courts are never mentioned.").

**18.** 25 U.S.C. §§ 2710(b)(1) and 2710(d).

**19.** 25 U.S.C. § 2703(4)(B); 25 C.F.R. § 502.12(b).

**20.** 25 U.S.C. § 2703(4).

(1) Held in trust by the United States for the benefit of any Indian tribe or individual; or

(2) Held by an Indian tribe or individual subject to restriction by the United States against alienation.[21]

Lands that do not qualify as Indian lands under IGRA generally are subject to state gambling laws.[22]

Section 2719(a) of IGRA provides that gaming shall not be conducted on lands acquired by the Secretary in trust for the benefit of an Indian tribe after October 17, 1988, unless certain exceptions are met. The general prohibition does not apply to lands that are located on or contiguous to the boundaries of the reservation of the Indian tribe[23] within the Indian tribe's "last recognized reservation within the State or States" within which the tribe is presently located.[24] In addition, the general prohibition does not apply when

lands are taken into trust as part of-

(i) a settlement of a land claim, [or]

(ii) the restoration of lands for an Indian tribe that is restored to Federal recognition.[25]

### D. Procedural/Factual history

The history of this litigation was not brought to the Court's attention until the TRO hearing, and was partly clarified at the preliminary injunction hearing. The Court has undertaken a comprehensive review of the procedural and factual history of the case. Although much of this history has been set forth before, both by the

district court and the Tenth Circuit, a recap is necessary to put the pending issues in context, given the eight year time lapse and particular slant given by the respective parties.

This long-pending litigation arose from the Tribe's efforts to take a tract of land in Kansas City, Wyandotte County, Kansas ("the Shriner Tract") into trust on behalf of the Tribe, purportedly under the mandate of Pub.L. 98–602, as part of its plan to conduct gaming in Kansas City, Kansas. Adjoining the Shriner Tract is a cemetery known as the "Huron Cemetery." Under an 1855 treaty with the United States, the Tribe ceded almost all of their property in Kansas to the federal government "except as follows. viz: The portion now enclosed and used as a public burying-ground, shall be permanently reserved and appropriated for that purpose."[26] Since 1855, the Huron Cemetery has been held in trust by the United States for the benefit of the Wyandottes.[27]

In 1984, Congress enacted legislation providing for the appropriation and distribution of money in satisfaction of judgments awarded to the Tribe by the Indian Claims Commission ("ICC") and the Court of Claims.[28] Key to this case was the directive that "[a] sum of $100,000 of such funds shall be used for the purchase of real property which shall be held in trust by the Secretary for the benefit of such Tribe."[29]

The NIGC Chairman approved the Tribe's gaming ordinance in June 1994.

---

**21.** 25 C.F.R. § 502.12.

**22.** *See National Indian Gaming Commission: Definitions Under the Indian Gaming Regulatory Act,* 57 Fed.Reg. 12382, 12388 (1992).

**23.** 25 U.S.C. § 2719(a)(1).

**24.** 25 U.S.C. § 2719(a)(2)(B).

**25.** 25 U.S.C. §§ 2719(b)(1)(B)(i), (iii).

**26.** January 31, 1855, Treaty with the Wyandot (II Kappler 677), approved, 10 Stat. 1159 (1855).

**27.** *See Conley v. Ballinger,* 216 U.S. 84, 90, 30 S.Ct. 224, 54 L.Ed. 393 (1910) (addressing ownership of the cemetery).

**28.** *See* Pub.L. 98–602, 98 Stat. 3149 (1984).

**29.** 98 Stat. 3151 (1984).

The approved ordinance is not site specific. In 1996, the Tribe requested that the Secretary of the Interior take the Shriner Tract into trust for the Tribe. The Tribe intended to purchase the Shriner Tract with the ICC funds and contended that the statute mandated that property purchased with such funds be taken into trust by the Secretary.[30] On June 12, 1996, the Assistant Secretary for Indian Affairs published a Notice in the Federal Register stating that the Bureau of Indian Affairs ("BIA") intended to accept title to the Shriner Tract in trust for the benefit of the Tribe for gaming purposes.[31] The purpose of the notice was to allow interested parties to seek judicial review of the proposed action.[32] Although the main reservation of the Tribe is located in Oklahoma, the Department of the Interior concluded in May 1996 that the Huron Cemetery was part of the Wyandotte "reservation" based on its reservation from cession in the 1855 treaty. Under that interpretation, the Tribe would be permitted to engage in Class II gaming and, if they were to negotiate a compact with the State, engage in casino-type Class III gaming.

On July 12, 1996, the last day of the comment period,[33] then-Governor Bill Graves, the Sac and Fox Nation of Missouri, Iowa Tribe of Kansas and Nebraska, and Prairie Band of Potawatomi Indians filed an action challenging the Secretary's decision to accept the Shriner Tract into trust, and that same day, obtained a temporary injunction preventing the trust acquisition.[34] The plaintiffs therein argued that the Secretary's decision to accept the Shriner Tract into trust was in error because 1) the Secretary was not mandated under Pub.L. 98–602 to accept the Shriner Tract; 2) the Secretary acted in an arbitrary and capricious manner when analyzing whether Pub.L. 98–602 funds were used to purchase the Shriner Tract; and 3) the Secretary failed to comply with the National Environmental Policy Act of 1969 ("NEPA"),[35] and the National Historic Preservation Act ("NHPA")[36] when accepting the Shriner Tract into trust.[37]

The Tribe moved to intervene and took an emergency appeal to the Tenth Circuit Court of Appeals. The Tribe asserted that if it was not able to close the land purchase immediately, it would lose the opportunity to purchase the land.[38] In the July 15, 1996 order vacating the injunction, the Tenth Circuit stated:

> *In order to preserve the status quo*, we grant the emergency application for stay and hold that the temporary restraining order entered below is dissolved, subject to the conditions which constitute the law of this case, that *the respective rights of the parties to obtain judicial review of all issues which have been raised in the complaint below shall be preserved,* including standing of all parties, jurisdiction, compliance by the Secretary with all requirements of law, and the ultimate question of whether gaming shall be permitted on the subject land.[39]

---

30. *See* 98 Stat. 3149, 3151 (1984).

31. 61 Fed.Reg. 29,757 (June 12, 1996).

32. *Sac and Fox Nation of Missouri v. Norton,* 240 F.3d 1250, 1256 (10th Cir.2001).

33. 25 C.F.R. § 151.12(b).

34. *Sac and Fox Nation of Missouri v. Babbitt,* 92 F.Supp.2d 1124, 1125 (D.Kan.2000).

35. 42 U.S.C. § 4321.

36. 16 U.S.C. § 470.

37. *Sac and Fox v. Babbitt,* 92 F.Supp.2d at 1128–29.

38. *See Sac and Fox v. Norton,* 240 F.3d at 1257.

39. *Sac and Fox Nation,* No. 96–3224, at slip op. 3 (10th Cir. July 15, 1996) (emphasis added).

That same day, the Secretary of the Interior accepted the Shriner Tract into trust for the benefit of the Tribe.

The State filed a Motion for Clarification, requesting the court to clarify the July 15 order to specifically prohibit gaming on the Shriner Tract.[40] The Tenth Circuit issued an order denying the motion, stating:

> After consideration of the Motion, we conclude that it should be denied.... Our July 15, 1996 order specifically states that all issues raised below are preserved for judicial review, including "the ultimate question of whether gaming shall be permitted on the land." The motion is DENIED.[41]

The Tribe subsequently voluntarily dismissed the appeal.

The matter was remanded to the district court, where the court dismissed the complaint for failure to join an indispensable party, the Tribe.[42] While the district court did not rule on the merits of the case, it did note that had it been required to address the merits, the court would have ruled the Pub.L. 98–602 was a mandatory trust acquisition statute, and that the nondiscretionary nature of the decision exempted it from the application of both NEPA and NHPA.[43] The district court left undecided the question of whether the Huron Cemetery was a reservation for purposes of the IGRA.[44]

The state plaintiffs appealed the district court's dismissal to the Tenth Circuit. On appeal, the Circuit rejected the district court's Rule 19 analysis, finding that the United States was able to adequately represent the Tribe's interests in the case.[45] The court affirmed the district court's conclusion that Pub.L. 98–602 is a mandatory trust acquisition statute, that the Secretary of Interior had no discretion in accepting title to the Shriner Tract in trust for the Tribe, and that neither NEPA nor NHPA analysis were required for the nondiscretionary decision to take the property into trust.[46] However, the Tenth Circuit concluded that it was unclear from the administrative record whether the Tribe had, in fact, used Pub.L. 98–602 funds to purchase the Shriner Tract.[47] Accordingly, the court remanded the case to the district court with instructions for the court to order the Secretary of the Interior to further consider the issue.[48]

After addressing the Pub.L. 98–602 issue, the Tenth Circuit turned to the question of the status of the Huron Cemetery.[49] The court noted that under *Chevron Inc. v. Natural Resources Defense Council, Inc.*,[50] courts typically extend considerable deference to determinations by executive agencies charged with the administration of a particular statute. The court stated, however, that "when Congress enacted the IGRA, it established the [National Indian Gaming] Commission and charged the Commission with exclusive regulatory authority for Indian gaming conducted pursuant to IGRA."[51] The Court concluded

---

40. *Id.* at slip op. 2 (10th Cir. July 16, 1996).

41. *Id.*

42. *Sac and Fox v. Babbitt,* 92 F.Supp.2d at 1124.

43. *Id.* at 1128.

44. *Id.* at 1129.

45. *Sac and Fox v. Norton,* 240 F.3d at 1262.

46. *Id.* at 1261–63.

47. *Id.* at 1263–64.

48. *Id.* at 1264.

49. *Id.*

50. 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).

51. 240 F.3d at 1265–66.

that because Congress vested the Commission, and not the BIA, with exclusive regulatory authority over Indian gaming, the court was not required under *Chevron* to extend any deference to the Secretary's determination that the Huron Cemetery was a reservation for purposes of the IGRA.[52] The court then determined that the Huron Cemetery was not a reservation for purposes of the IGRA, as Congress had contemplated, and directed the district court to enter judgment declaring that the Huron Cemetery was not a reservation for purposes of the IGRA.[53]

On remand, the district court remanded the case to the Secretary of the Interior "to reconsider whether Pub.L. 98–602 funds alone were used to purchase the Shriner Tract in connection with the decision to approve taking the Shriner Tract into trust for [the Tribe]." [54] The district court also entered judgment "declaring that the Huron Cemetery is not a 'reservation' for purposes of the [IGRA]."

On March 11, 2002, the Secretary issued her decision following remand, adopting the Tribe's tracing theory as to the theoretical value of the Pub.L. 98–602 funds as of July 1996 (the closing date) after the funds had been commingled in an investment account of the Tribe and affirming the trust status of the Shriner Tract. The State requested reconsideration of the determination, and the parties were permitted to brief the issues. The Secretary issued an Opinion on Reconsideration on June 12, 2002, affirming that the Shriner Tract was purchased with Pub.L. 98–602 funds and that it was validly taken into trust by the Secretary.

Meanwhile, on June 20, 2002, the Tribe submitted an amended gaming ordinance specific to the Shriner Tract. The Tribe also submitted documentation supporting its claim that the Shriner Tract met three separate IGRA exceptions to the prohibition on gaming on post–1998 acquired lands. On August 27, 2002, the Tribe withdrew the amended ordinance to give the NIGC more time to issue an Indian lands opinion. The Tribe later advised the NIGC that it did not plan to game on the Shriner Tract after all.[55]

On July 11, 2003, the State of Kansas, *et al.*, filed a Complaint for Declaratory and Injunctive Relief, Mandamus and Review of Final Agency Action, in the case of *Governor v. Norton*, No. 03–4140–JAR, 2004 WL 955398 (D.Kan. 2004). That case challenges as arbitrary and capricious the Secretary's determination to accept the Shriner Tract into trust for the benefit of the Tribe and remains pending before this Court.[56] The State seeks to have the taking of the Shriner Tract into trust as void *ab initio*. To date, the State has not requested a stay of the Department of Interior's decision on remand to accept the Shriner Tract into trust.

On or about August 28, 2003, the Tribe commenced Class II gaming on the Shriner Tract. The Tribe placed a trailer type building on the site and called the casino the "7th Street Casino." The Tribe resubmitted the supporting material from June 2002 to the NIGC.[57]

In September 2003, the State of Kansas, ex rel, Phill Kline, Attorney General of the State of Kansas filed an action against the

---

**52.** *Id.*

**53.** *Id.* at 1267.

**54.** *Sac and Fox Nation v. Norton*, No. 96–CV–4129 (D.Kan. Aug. 22, 2001).

**55.** NIGC Memorandum, Plaintiff's Ex. B.

**56.** To date, the state has filed its opening Markham brief and the Secretary has responded. The state's reply brief is due October 18, 2004, at which time the matter will be under advisement.

**57.** NIGC Memorandum.

Secretary of the Interior and Phil Hogen, Chairman of the NIGC, captioned *Kansas v. Norton*, Case No. 03–4179–JAR. The State sought to require that the NIGC take action to "prohibit any gaming operations until full compliance with all statutory and legal requirements of [the National Historic Preservation Act (NHPA)] and the [National Environmental Policy Act (NEPA)] have been conducted which will adequately protect historical concerns, the environment and the public health and safety." On May 11, 2004, the parties in that case filed a Stipulation of Dismissal.

On March 24, 2004, the Acting General Counsel for the National Indian Gaming Commission ("NIGC") sent a letter to the Tribe's leader, Chief Leaford Bearskin, which attached a Memorandum from a NIGC staff attorney. The Memorandum presupposed that the Shriner Tract was "trust land." After a detailed analysis, the Memorandum concluded that the NIGC was satisfied that the Shriner Tract meets the statutory and regulatory definition of "Indian lands" because it was trust land that was within the Tribe's jurisdiction and over which the Tribe governed. The Memorandum cautioned that such a determination was not the end of the inquiry of whether the Tribe can conduct gaming on the Shriner Tract. The Memorandum ultimately concluded that the Shriner Tract does not meet any of the exceptions to the IGRA's general prohibition on gaming on tribal trust lands acquired after 1988, and that therefore, the Tribe may not game on the Shriner Tract under the IGRA. The Memorandum stated that the NIGC would allow the Tribe a week to provide its views on the opinion. The Tribe subsequently submitted materials to the NIGC disputing the Memorandum opinion. To date, the NIGC has not taken further action on that opinion.

In response to the Memorandum, the Tribe filed the instant action against the Federal Defendants in the United States District Court for the District of Columbia on March 26, 2004, seeking review of the NIGC's Memorandum under the Administrative Procedure Act ("APA"). The Tribe filed a Motion for a Temporary Restraining Order, seeking to enjoin the Federal Defendants from taking any enforcement action based on the NIGC Memorandum pending judicial review. At a hearing before the Honorable James Robertson, the Federal Defendants took the position that the NIGC Memorandum was merely an opinion from a staff attorney and did not constitute final agency action. Judge Robertson agreed, and denied the Tribe's request for TRO. Although the Tribe represented to the court that the Kansas Attorney General had threatened to shut down the casino, the court noted that the State was not a party in that case and thus it lacked jurisdiction.

On April 1, 2004, the State Defendants sought and obtained a search warrant from the district court of Wyandotte County, Kansas, where the Shriner Tract is located. The search warrant is based on allegations of violations of State gaming laws. On April 2, 2004, law enforcement officials from Kansas City Police Department, Kansas Bureau of Investigation and Office of the State Attorney General executed the search warrant at the 7th Street Casino. Despite the protests of the Tribal police and casino employees that they were on Tribal land, law enforcement interrogated approximately ten patrons and proceeded to seize and remove the Tribe's property, including files, cash, gaming equipment and other property. The cash seized amounts to approximately $502,000, which includes monies seized from a bank account owned by the Tribe, and over $75,000 worth of gaming equipment. Ellis Enyart, the casino's general manager, was arrested and charged in Wyandotte County District Court with illegal possession of

a gambling device and illegal commercial gambling.

In light of the events of April 2, 2004, the Tribe filed an Amended Complaint in the case pending against the Federal Defendants in the District of Columbia naming the State Defendants, as well as a Renewed Motion for TRO seeking to, *inter alia*, enjoin the State Defendants from taking any further enforcement activity related to gaming on Tribal lands, and to return all property unlawfully seized. Judge Robertson conducted a telephone hearing on the motion for TRO, and entered an order stating:

> The raid by Kansas law enforcement officials on the Wyandotte gaming facility located on the so-called Shriner Tract in Kansas City on the morning of April 2, 2004, *appears to have been unlawful*, because the Shriner Tract is indisputably Indian land, and because exclusive jurisdiction of gambling on Indian lands is vested in the United States pursuant to 18 U.S.C. § 1166(d). Class II gaming on the Shriner Tract is not only subject to the Indian Gaming Regulatory Act, but is a matter currently and actively before the National Indian Gaming Commission. (emphasis added).

The court determined that it was powerless to grant effective relief due to lack of personal jurisdiction over the State Defendants, and *sua sponte* transferred this action to the District of Kansas, without ruling on the Tribe's motion. Neither the State nor Federal Defendants participated in that telephone hearing.

The Tribe refiled the Renewed Motion for TRO with this Court, requesting, *inter alia*, the Court order the State Defendants to cease and desist all enforcement actions, immediately return all property seized, and prohibit the defendants, or anyone acting in concert with the defendants, from relying on the March 24, 2004 NIGC Memorandum. At the hearing, the State Defendants argued in defense of their raid of the casino that the issue of whether the Shriner Tract constitutes Indian land is "in play," citing the 1996 Tenth Circuit Orders. Notably, this was the first time the Court had been apprised of the history of these proceedings stemming from those 1996 orders, as no mention was made in the documents and briefing filed by the Tribe. After hearing arguments, the Court denied the Tribe's motion from the bench. The Tribe appealed the denial to the Tenth Circuit Court of Appeals, which determined that it lacked jurisdiction over the Tribe's case. This Preliminary Injunction motion followed, wherein the Tribe's quest for relief continued its evolution.

### Discovery issues

At the Tribe's request, the Court conducted a telephone status conference, at which time the Tribe clarified that it would not seek leave to amend its complaint a third time, and that it would dismiss all claims against the Federal Defendants. The Tribe also clarified that it was no longer claiming or relying on any economic or financial loss as a basis for which to establish irreparable injury in support of its motion for preliminary injunction. Instead, the Tribe was contending that the irreparable harm was violation of its sovereign rights, which it contends is a purely legal issue. State and Municipal Defendants still wanted to conduct discovery, however, and the Court granted the defendants 30 days to conduct Rule 30(b)(6) depositions on the issues of the factual basis for which the defendants are being sued in their official capacity and the factual basis for the Tribe's claim that irreparable harm is threatened by each defendant; and a briefing schedule was established. An order dismissing the Federal Defendants (Doc. 90) was entered.

The Defendants filed an Amended Notice of Deposition Duces Tecum, describing the topics as the issues set out by the Court in its order memorializing the telephone status conference. No objection to the scope of the topics or amended notice was made by the Tribe, nor did it file any motion for protective order relating to the deposition.

The deposition was taken on June 29, 2004. The Tribe's designated Rule 30(b)(6) witness was Ellis Enyart. The Tribe had also submitted two affidavits of Mr. Enyart, executed in April 2004, in support of its motion for preliminary injunction.[58] After confirming that he was the representative of the Tribe, and was designated by Chief Bearskin, Enyart refused to answer any questions on the substance of either Rule 30(b)(6) topic notices, claiming a Fifth Amendment privilege. Enyart appeared with individual counsel, Winston Connor of Miami, Oklahoma. At the time of the deposition, Enyart was facing criminal charges in Wyandotte County District Court. Enyart testified that he had no communication with counsel for the Tribe, Conly Schulte, about the deposition prior to the deposition. Mr. Schulte, however, claimed attorney-client privilege on this subject. Despite threats from defense counsel, the Court was not called or contacted about Enyart's refusal to testify at the deposition.

On June 30, 2004, counsel for Municipal Defendants Marinovich and Miller conferred with counsel for the Tribe about issues arising from the deposition, as required by D. Kan. R. 37.2. Counsel inquired as to 1) if and when the Tribe's counsel knew prior to the deposition that Enyart would invoke the Fifth Amendment and 2) whether the Tribe would prepare and produce a knowledgeable substitute witness. Counsel for the Tribe 1) refused to state when the Tribe or its counsel first knew that Enyart would take the Fifth and 2) indicated that the Tribe did not intend to produce an alternate Rule 30(b)(6) deponent. Counsel for the State Defendants did not attempt to confer with the Tribe's counsel.

Municipal Defendants Marinovich and Miller seek relief under Rule 37(d) based on the Tribe's failure to prepare and produce a witness to testify on the substance of the topics at issue:

a) That the affidavits of Ellis Enyart submitted as exhibits in support of the Tribe's motion for preliminary injunction and all other submissions of the Tribe containing factual materials concerning the topics of the Rule 30(b)(6) notice in support of its motion for preliminary injunction be stricken or not considered in connection with plaintiff's motion as providing any factual basis for plaintiff's allegations against defendants or of irreparable harm;

b) That the Tribe otherwise be precluded from offering any factual evidence or basis for claims against any defendant or any factual evidence or basis for its claim of irreparable harm; or

c) The hearing scheduled for July 19, 2004 be continued until such time as the Tribe produces and defendants can depose an alternate witness prepared and willing to testify.

The State Defendants joined in the motion filed by Marinovich and Miller.

The Tribe moved to strike the State Defendants' motion as they did not comply with D. Kan. Rule 37.2 because they did not confer with counsel prior to filing the motion for relief. Although Hendricks communicated with counsel, he did not indicate that he did so on behalf of all defendants. The Tribe also moved for a protec-

58. (Doc. 100, ex. F and G).

tive order pursuant to Rule 26(c)(1) and D. Kan. Rule 7.1(a) concerning Defendants' Amended Notice of Deposition Duces Tecum (filed June 19). The Tribe argues that Enyart had every right to invoke the Fifth Amendment and that the documents provided by Enyart at the deposition supplied defendants with the factual basis for the Tribe's irreparable injury claim and for suing defendants in their official capacities. The Tribe asserts that no Tribal representative can testify as long as the criminal proceedings were pending.

On July 7, 2004, the Wyandotte County District Court dismissed the criminal proceedings against Ellis Enyart. The court rejected the State's argument that it had jurisdiction to prosecute Mr. Enyart, concluding that the Kansas Act did not govern the case because Kansas' laws with respect to gaming are regulatory rather than prohibitory. Even if the Kansas Act did govern the case, the court held that the IGRA preempted state law. Finally, the court rejected the State's argument that because the IGRA only includes gaming on "Indian lands" and because it is appealing this status, it is removed from the rubric of the IGRA, as both parties agree that the Shriner Tract has been held in trust for the benefit of the Tribe since July 15, 1996. The State has appealed this order.

Neither party called any witnesses at the Preliminary Injunction hearing, relying instead on argument, documents and briefing. The admissibility of the affidavits of Ellis Enyart and Chief Bearskin was taken under advisement. The Tribe and Municipal Defendants filed a Stipulation of Dismissal, to which the State Defendants objected.

## II. Motion to Dismiss Marinovich and Miller

In response to State Defendants' objection to the Stipulation of Dismissal, Municipal Defendants filed a Motion for Dismissal with Prejudice Under Rule 41(a)(2) in Accordance with Stipulation (Doc. 134). State Defendants respond that they have no objection to such dismissal provided that nothing in the dismissal order be construed to preclude any right of State Defendants to subsequently seek contribution from Municipal Defendants in the event that the Tribe is ultimately awarded costs and expenses in this case.

In order to obtain dismissal of the Municipal Defendants, the Tribe must obtain an order of the court because the opposing parties have filed answers.[59] A Stipulation filed under Rule 41(a)(1) is not appropriate unless signed by all parties who have appeared in the action. The grant or denial of a dismissal on motion under Rule 41(a)(2) is within the sound discretion of the court.[60] The court may impose terms and conditions on the dismissal.[61] Having reviewed the applicable factors, the Court determines that the motion to dismiss Municipal Defendants with prejudice should be granted. State Defendants have offered no valid reason for the Court to deny dismissal of Municipal Defendants. According to State Defendants, a claim against Municipal Defendants for contribution pursuant to Fed.R.Civ.P. 13(g) is not required to be asserted in the instant case, but may be asserted in a subsequent case. Accordingly, the Court shall grant dismissal of the claims against Municipal Defendants with prejudice.

## III. Discovery Issues

 The Court is mindful, as the Supreme Court has cautioned, that "a prelim-

---

**59.** Fed.R.Civ.P. 41(a)(2); *Clark v. Tansy*, 13 F.3d 1407, 1411 (10th Cir.1993).

**60.** *Clark*, 13 F.3d at 1411.

**61.** *Id.*

inary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits." [62] A hearing for preliminary injunction is generally a restricted proceeding, often conducted under pressured time constraints, on limited evidence and expedited briefing schedules. [63] The Federal Rules of Evidence do not apply to preliminary injunction hearings. [64] To state the obvious, when a district court holds a hearing on a motion for preliminary injunction, it is not conducting a trial on the merits. Nonetheless, the Court did grant Defendants' request for discovery and the Tribe was under an obligation to proceed under the terms of the Court's order.

Fed.R.Civ.P. 37(d) permits the imposition of sanctions when a party or person designated under Rule 30(b)(6) fails "to appear before the officer who is to take the deposition, after being served with proper notice." These sanctions range from taking the matters as established to striking the pleadings, as set forth in Rule 37(b)(2)(A)—(C). The court may also order payment of reasonable expenses, including attorney fees, caused by the failure.

Failure to adequately prepare a witness is akin to failure to appear. [65] Courts have stricken affidavit testimony where a party gives affidavit testimony but refuses to allow deposition questioning to test the veracity of the affidavit. [66] Notably, Defendants did not attempt to contact the Court when Enyart refused to testify at the de-

position. Ultimately, Enyart did not testify at the preliminary injunction hearing, so Defendants' ability to effectively cross-examine him is not an issue. Moreover, Enyart's affidavits do not really speak to the merits of the Tribe's claim of irreparable injury, interference with sovereign rights. Rather, the affidavits merely recite the factual circumstances surrounding the raid of the casino, which are not in dispute.

If counsel for the Tribe knew that Enyart was going to take the Fifth prior to the deposition, it may have been unreasonable for him not to notify defense counsel. It is not clear from the record whether Mr. Schulte was aware that Enyart, who was represented by separate counsel, planned to take the Fifth. In fact, Enyart testified at the deposition that he did not discuss the deposition with counsel prior to June 29. The Court finds this issue to be without consequence, however, in light of the voluntary dismissal of the parties raising the issue, Marinovich and Miller, and the nature of the substance of his affidavits. Accordingly, the Court overrules the parties' respective motions.

## IV. Preliminary Injunction Standard

In this case, the Tribe seeks 1) an injunction prohibiting and enjoining the State Defendants from asserting jurisdiction over any gaming or related activity on the Shriner Tract; and 2) an order requiring State defendants to immediately return all property seized from the Tribe's

**62.** *Heideman v. South Salt Lake City,* 348 F.3d 1182, 1188 (10th Cir.2003) (quoting *University of Texas v. Camenisch,* 451 U.S. 390, 395, 101 S.Ct. 1830, 68 L.Ed.2d 175 (1981)).

**63.** *Id.*

**64.** *Id.*

**65.** *Starlight International Inc. v. Herlihy,* 186 F.R.D. 626, 639 (D.Kan.1999) (citations omitted).

**66.** *See United States v. One Parcel of Real Property Commonly Known as 901 N.E. Lakewood Dr., Newport, Oregon,* 780 F.Supp. 715, 720–22 (D.Or.1991) (striking affidavits because affiants asserted Fifth Amendment privilege).

gaming facility. The Tribe also seeks a declaratory judgment that the Tribe may lawfully conduct gaming on the Shriner Tract and that the state defendants have no jurisdiction over the Tribe's lands. At the Preliminary Injunction hearing, the Tribe modified its request somewhat, and represented that it is no longer asking for an affirmative order regarding gaming. To date, the Tribe has not amended its complaint to this effect.

■ Whether or not to grant preliminary injunctive relief is within the sound discretion of the district court.[67] To obtain a preliminary injunction in federal court, the movant has the burden of establishing that:

1) the party will suffer irreparable injury unless the motion is granted;

2) the threatened injury to the moving party outweighs whatever damage the proposed injunction may cause the opposing party;

3) the injunction, if issued, would not be adverse to the public interest; and

4) there is a substantial likelihood that the moving party will eventually prevail on the merits.[68]

If the moving party satisfies the first three elements, the standard for meeting the fourth requirement, likelihood of success on the merits, generally becomes more lenient and the movant "need only show that the issues are so serious, substantial, difficult, and doubtful as to make them fair ground for litigation." [69]

In some cases, however, the standard for issuance of preliminary injunctive relief is heightened. If the preliminary injunction disturbs the status quo, is mandatory as opposed to prohibitory, or affords the movant substantially all the relief he may recover at the conclusion of a full trial on the merits, the movant must carry the heavier burden of showing that the traditional four factors weigh "heavily and compellingly" in favor of granting the injunction.[70] In this case, the Tribe's request for injunctive relief is both prohibitive and mandatory in character, and the parties concur that the heightened standard applies in this case.

### Status quo

The term "status quo" is not defined by the parties' existing *legal rights;* it is defined by the *reality* of the existing status and relationship between the parties, regardless of whether the existing status and relationships may ultimately be found to be in accord or not in accord with the parties' legal rights.[71] The Tenth Circuit has rejected an "absolute" approach to defining the status quo, instead holding that "the definition of 'status quo' for injunction purposes depends very much on the facts of a particular case." [72] The status quo need not be the state of affairs immediately preceding the litigation.[73] The parties' definition of the status quo is at the heart

67. *Tri–State Generation and Transmission Ass'n, Inc. v. Shoshone River Power, Inc.*, 805 F.2d 351, 354 (10th Cir.1986).

68. *Kiowa Indian Tribe of Oklahoma v. Hoover,* 150 F.3d 1163, 1171 (10th Cir.1998).

69. *Winnebago Tribe of Nebraska v. Stovall,* 216 F.Supp.2d 1226, 1231 (D.Kan.2002), aff'd, 341 F.3d 1202 (10th Cir.2003) (quoting *Resolution Trust Corp. v. Cruce,* 972 F.2d 1195, 1199 (10th Cir.1992)).

70. *SCFC ILC, Inc., v. Visa USA, Inc.,* 936 F.2d 1096, 1099 (10th Cir.1991).

71. *Id.* at 1100 (emphasis in original) (alternatively defining status quo as the "last uncontested status between the parties which preceded the controversy . . . .").

72. *O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft,* 342 F.3d 1170, 1178 (10th Cir.2003).

73. *Id.*

of these proceedings and very much in dispute.

The State Defendants contend that there is a "seamless thread" between the first Shriner Tract cases in 1996 and the present Shriner Tract cases, and thus the law of the case established in the 1996 orders applies. This law of the case does not permit federal preemption of gaming on the Shriner Tract and preserves the right of the State of Kansas to assert its criminal jurisdiction. The State Defendants argue that while dissolving the TRO, the Tenth Circuit failed to transfer sovereignty to the Tribe. In those orders, the court prohibited the Tribe from gaming on the Shriner Tract during the pendency of the case. If the Tenth Circuit had permitted the land to be taken into trust as sovereign Indian land, the Federal government would have no jurisdiction to limit Class I gaming. As the Tenth Circuit clearly prohibited Class I gaming, then the Shriner Tract was taken into trust without granting sovereignty and thereby not allowing the property to become Indian land as defined by the IGRA, which is consistent with the Tenth Circuit's position that the status quo be retained. Thus, state defendants conclude, the last *uncontested* status between the parties prior to the controversy in this case was that the land was sovereign Kansas land and that Kansas has the jurisdiction to prosecute and enforce criminal law.

The Tribe counters that the June 2003 decision of the Secretary affirming that the Shriner Tract was properly taken into trust because the funds used to purchase it were from the original $100,000 allotted to the Tribe by Pub.L. 98–602 is a final order, and thus there is no question that it is Indian land. The Tribe disputes that the issue of jurisdiction and sovereignty is still "in play." In fact, the Tribe asserts, those orders do not in any way prohibit gaming, and merely allowed the State of Kansas to obtain judicial review of the decision to take the land into trust-a decision that has been resolved in favor of the Tribe. The 1996 orders have been superseded by numerous additional orders and the law of the case does not apply as the pending case of *Governor v. Norton*, 03–4140, is separate from the first Shriner tract cases, since it was filed as a new case and has been assigned a new case number.

After reviewing the history of these proceedings, the Court finds that the 1996 Tenth Circuit orders both preserved and generated the current litigation concerning the propriety of the decision of the Secretary to take the Shriner Tract into trust. Those orders, in order to preserve the status quo, permitted the Shriner tract to be taken into trust subject to the conditions which constitute the law of the case, specifically the respective rights of the parties to obtain judicial review of all issues raised by the state in its complaint, including jurisdiction, compliance by the Secretary and the ultimate question of whether gaming shall be permitted. While the court subsequently denied the State's request for clarification on the gaming issue, this Court attributes the denial to the court having already ruled that the question of whether gaming *would be allowed* was preserved.

Accordingly, in light of the reality of the existing relationship between the parties, the Court finds that the status quo stems from the 1996 order permitting the Shriner Tract to be conditionally taken into trust. The Court reads these orders to prohibit both gaming by the Tribe and enforcement by the State pending judicial review of the decision to take the land into trust. Although it has taken eight years and two remands, the final piece of that issue is currently before this Court for judicial review in *Governor v. Norton.* The State Defendants are correct that *Governor v. Norton* is a "seamless thread"

from the first Shriner Tract cases. The fact that it is a newly filed case is of no consequence-it is an action for review under the APA that flows from a series of judicial and administrative orders stemming from the 1996 Tenth Circuit orders, which clearly establish the law of the case. However, the Court disagrees with the State Defendants' interpretation of the orders as preserving the State's sovereignty over the land-such a reading clearly overreaches the intent of the Tenth Circuit. It is within this context that the Court will analyze the preliminary injunction standards.

## V. Analysis

### A. Irreparable Injury

A plaintiff suffers irreparable injury when the court would be unable to grant an effective monetary remedy after a full trial because damages would be inadequate or difficult to ascertain.[74] In this case, the Tribe has abandoned any claim of monetary or financial harm. Instead, the Tribe argues that any intrusion upon an Indian tribe's sovereignty constitutes irreparable injury as a matter of law, citing *Kiowa Indian Tribe of Oklahoma v. Hoover*[75] and *Winnebago Tribe of Nebraska v. Stovall*.[76]

In *Winnebago*, Judge Marten determined that the mere fact that state defendants seized the plaintiff Indian tribe's assets, for the alleged violation of Kansas statutes, constitutes irreparable injury as a matter of law.[77] In that case, plaintiff Indian tribes sought a preliminary injunction against state officials arising out of the state's attempt to enforce the Motor

Vehicle Fuel Tax Act.[78] The plaintiffs also requested that the state defendants return seized property.[79] Judge Marten granted the preliminary injunction (upholding Judge Saffels's grant of the TRO), finding that plaintiffs had satisfied the irreparable injury element:

> The court finds that plaintiffs have demonstrated that they will suffer irreparable injury in that monetary damages will not be sufficient to undo the damage with which plaintiffs are currently faced. As noted by the court at the [TRO] hearing, this is not a matter of how much capital will be lost if the injunction is not imposed. **Instead, the issues concern the scope of tribal sovereignty, an issue that cannot be measured in dollars.**[80]

Similarly, the Court finds in this case that the Tribe has demonstrated that it will suffer irreparable injury. Clearly, if it is found that state defendants are unlawfully enforcing state gaming laws against the Tribe, it will be damaged in a way that is not monetarily compensable.

### B. Harm to Opposing Party

The Tribe argues that the defendants will not be injured by the Court granting a preliminary injunction for several reasons. First, the Tribe had been operating without interference from the defendants for seven months prior to the raid. Second, contrary to the representations made by defense counsel Steve Alexander at the TRO hearing, the Tribe's gaming facility is regulated, as the NIGC and Tribal Gaming Commission have regulated it from the time it opened pursuant to the IGRA. Third, the Tribe's operation

74. *Tri–State Generation and Transmission Ass'n, Inc. v. Shoshone River Power, Inc.*, 874 F.2d at 1354.

75. 150 F.3d 1163 (10th Cir.1998).

76. 216 F.Supp.2d at 1233.

77. *Id.*

78. *Id.* at 1230.

79. *Id.*

80. *Id.* at 1233 (emphasis added).

of Class II gaming in Kansas on the Shriner Tract is not clearly against the State's public policy or laws, as gaming is lawful in the State of Kansas.

The State Defendants argue that unregulated gaming could have been occurring at the Shriner Tract, as no one has determined whether these games are Class II or Class III, although the record contains no evidence that anything but Class II was conducted at the casino. In addition, State Defendants argue that the State and local government are harmed as an injunction would prohibit enforcement of criminal law. The claim that the Tract is indisputably "Indian land" is untenable given the 1996 orders of the Tenth Circuit.

The Court agrees that an order enjoining the state defendants from exerting jurisdiction could very well adversely affect the State of Kansas' sovereignty, but in the context of entering a preliminary injunction, the Tribe is faced with more devastating losses than the state defendants' temporary inability to enforce its state gaming laws. In considering the balance of harm, the Court finds that the harm to the Tribe in not granting the injunction outweighs the harm to the state defendants in granting it.

### C. Public Interest

██ The Tribe argues that issuance of the preliminary injunction will halt State Defendants' lawless exertion of jurisdiction over the Shriner Tract and that the public interest will be furthered by restoration of jurisdiction over the Shriner Tract to the NIGC and the Tribal Gaming Commission. Entry of an injunction restores the federal regulatory regime that the State has illegally ousted, and is the only way to serve the public interest in this case.

State Defendants counter that the public interest is best served when the Tribe and

individuals comply with the applicable laws and procedures in the conduct of their business. Defendants note that the Tribe has come into court without clean hands this situation was created by the Tribe when they unilaterally chose to open a gaming casino without the benefit of any regulatory or judicial determination that the location was "Indian land." The public is harmed by an illegal gaming activity.

The Court finds that while the public has an interest in seeing that civil and criminal laws are enforced, a preliminary injunction as to the State Defendants' exercise of jurisdiction over the Shriner Tract does not permanently impose on the state's ability to prosecute.[81] Instead, the State Defendants are only required to refrain from enforcement until these critical sovereignty issues can be adjudicated. Thus, the Court finds that issuing the preliminary injunction in this case would not be contrary to public interest.

### D. Likelihood of Success on the Merits

As previously discussed, the Court will apply the heightened standard in this case, and the Tribe must establish a substantial likelihood that it will succeed on the merits. With the dismissal of the Federal Defendants, only three of the original eight counts of the Tribe's amended complaint remain pending. Count I seeks a declaratory judgment that the Tribe may lawfully conduct gaming on the Shriner Tract and that the State Defendants have no jurisdiction over the Tribe's lands. Counts VII and VIII seek injunctive relief as detailed above.

The Tribe contends that the underlying issue in this case is whether the defendants' assertion of jurisdiction over the Tribe and the Shriner Tract is lawful. According to the Tribe, defendants had abso-

---

81. *Id.* at 1234.

lutely no jurisdiction to take enforcement action on tribal lands under federal law, specifically the IGRA. The Tribe stresses that at the TRO hearing, the United States Attorney and the NIGC agreed that the State Defendants lacked jurisdiction over the Shriner Tract, as the IGRA has preempted the State on this issue. The Tribe also cites to the decisions of the D.C. District Court and the District Court of Wyandotte County, which both concluded that the Shriner Tract was in trust and "unquestionably" Indian land.

The Tribe argues that the United States has held the Shriner Tract in trust for the benefit of the Tribe since July 15, 1996. The Tribe contends that per the Tenth Circuit's and this Court's instruction, the Department of Interior, Bureau of Indian Affairs, has definitively reaffirmed the trust status of the Shriner Tract, citing *Sac and Fox Nation of Missouri v. Norton*[82] and *Sac and Fox Nation of Missouri v. Babbitt.*[83] The Tribe argues that Supreme Court precedent and the Administrative Procedure Act mandates that the Secretary's determination to take the Shriner Tract into trust is binding unless overturned.

State Defendants continue to argue that the issues of sovereignty and jurisdiction were preserved by the Tenth Circuit in the 1996 orders, and the July 2003 decision of the Secretary to take the Shriner Tract into trust is not a final order because this Court still has jurisdiction over this matter in *Governor v. Norton.* State Defendants contend that it is imperative to keep in mind at this point in the litigation that the ultimate status of the Shriner Tract—whether to remain in trust or not—is currently pending in that case. State Defendants take issue with the D.C. and Wyandotte County courts' orders concluding that the land was "Indian land" and that the IGRA applies, since those courts were not apprised of the case history, specifically the 1996 orders, and presupposed the Shriner Tract had been validly taken into trust.

The Court agrees in part with State Defendants. The ultimate issue in this case is whether the Shriner Tract is Indian land. The Tenth Circuit has foreclosed one aspect of this question by determining the Huron Cemetery is not a reservation. Thus, the penultimate issue, key to these proceedings, is whether the Shriner Tract was validly taken into trust. Under the law of the case established by the July 15, 1996 Tenth Circuit order, whether the Shriner Tract was properly taken in trust and thus Indian land is still "in play" as it is subject to judicial review. The end result of *Sac and Fox v. Norton* was that the case was remanded back to the district court, which in turn, remanded it back to the Secretary for further review. The Tribe's narrow view that the law of the case only applies to the immediate remand of the case deprives the State of due process rights that were preserved by the Tenth Circuit in the July 1996 orders. The case currently pending before this court, *Governor v. Norton,* arises out of the remand to the Secretary. The issue now before the Court is whether the Secretary's affirmation of the previous decision was done with further consideration in light of the Tenth Circuit's order. While the Secretary's order is a final order for purposes of the APA, it is not preclusive under the terms of the 1996 order. It is the merits of this issue that must be analyzed in the context of the Tribe's request for preliminary injunction.

**82.** 240 F.3d 1250.

**83.** No. 96–CV–4129 (D.Kan. August 22, 2001) (order remanding case to Secretary of the Interior to reconsider whether Pub.L. No. 98–602 funds alone were used to purchase the Shriner Tract).

■ Judicial review of an agency's final action is governed by the Administrative Procedure Act ("APA").[84] Under the APA, a federal court may set aside agency action if it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.[85] An agency decision is arbitrary or capricious if: (1) the agency entirely failed to consider an important aspect of the issue; (2) the agency offered an explanation for its decision that was counter to the evidence before it; (3) the agency relied on factors that Congress did not intend for it to consider; or (4) the agency's decision is so implausible that it could not be ascribed to the product of agency expertise.[86]

■ In reviewing an agency action the court must "determine whether the Agencies: (1) acted within the scope of their authority, (2) complied with prescribed procedures, and (3) took action that was neither arbitrary and capricious, nor an abuse of discretion. Within this context, we will set aside the Agencies' factual determinations only if they are unsupported by substantial evidence." [87]

■ Neither party specifically addresses the merits of the issues underlying this pending administrative appeal. To date, the parties in *Governor v. Norton* have not completed briefing the issues addressing the merits of the underlying case. The issues are complex and will need significant development before this Court can ultimately rule. However, there are certain facts and circumstances that indicate a substantial likelihood of success on the merits in favor of the Tribe, which is not a party to that case, but whose interests are represented by the Secretary of Interior.[88]

The July 2003 decision of the Secretary was made on remand from the Tenth Circuit. That decision determined that the funds used to purchase the Shriner Tract were from settlement moneys granted by Pub.L. 98–602. The Circuit concluded that the Secretary's determination that Pub.L. 98–602 funds were being used for the purchase was not supported by substantial evidence in the record and remanded to the Secretary for further consideration of this issue. On remand, the Secretary retained an independent accounting firm to analyze the Tribe's accounting of the Pub.L. 98–602 funds, which was reviewed by a financial analyst for the Department of Interior. The Court's review of the pleadings filed to date indicates the record appears to contain much more information to support the Secretary's decision. Given the deferential standard of review under the APA, obtaining reversal of the final agency action regarding taking the Shriner Tract into trust will be difficult. Accordingly, the Court concludes that the Tribe has a substantial likelihood of success on the merits in their challenge to the state defendants' exercise of jurisdiction over the Shriner tract-if the Court upholds the Secretary's decision that the Shriner Tract is properly held in trust, then it is Indian land and the State Defendants lack jurisdiction.

State Defendants argue in the alternative that the Kansas Act[89] controls the

---

84. *See* 5 U.S.C. §§ 701 to 706; *Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 882, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990).

85. 5 U.S.C. § 706(2)(A).

86. *Colorado Environmental Coalition v. Dombeck,* 185 F.3d 1162, 1167 (10th Cir.1999).

87. *Wyoming Farm Bureau Fed'n v. Babbitt,* 199 F.3d 1224, 1231 (10th Cir.2000) (citations omitted).

88. *Sac and Fox v. Norton,* 240 F.3d at 1262.

89. 18 U.S.C. § 3243.

issue of criminal jurisdiction on Indian lands. If the Tribe is correct that land held in trust is "Indian land," the State Defendants contend that the state has at a minimum concurrent jurisdiction with the federal government over the Shriner Tract as the Tribe consented to the application of the Kansas Act by its withdrawal of its Tenth Circuit appeal in 1996 and acquiescence to the orders. This argument is without merit. The IGRA appears to preempt the Kansas Act.[90] The IGRA confers power to enforce Indian gaming laws exclusively with the United States.[91] The structure of the IGRA permits assertion of state civil or criminal jurisdiction over Indian gaming *only* when a tribal-state compact has been reached to regulate Class III gaming.[92] No such compact has been reached. Withdrawal of the appeal, where no issues remained, is hardly a consent to jurisdiction.

After the Preliminary Injunction hearing, Municipal Defendants submitted supplemental authority in support of their assertion of proper jurisdiction, and State Defendants joined with them. Although Municipal Defendants have been dismissed, State Defendants continue to posit that the recent case of *Wyandotte Nation v. Unified Government of Wyandotte County/Kansas City, Kansas*[93] establishes that the express language of the Treaty of 1855 between the Wyandotte Nation and the United States made state and federal law applicable to all of the "Wyandotte country" within Kansas.[94] The Tribe counters that the case is inapposite to this

case because it did not involve gaming, but a statute of limitations issue, where no federal law is applicable. Further, the Tribe argues that the Treaty of 1855 does not apply to lands taken into trust and that if it did, the IGRA displaces the treaty. The Court notes that the *Wyandotte v. Unified Government* case did not become final until August 16, 2004, and neither party has fully briefed its applicability to this case. If the Tribe is correct that the Shriner Tract is Indian land, further briefing on this issue will be necessary.

Finally, State Defendants argue that the *Younger* abstention doctrine[95] and the Anti–Injunction Act apply, and the federal district court lacks jurisdiction to enjoin or otherwise interfere with a state court criminal case. State Defendants argue that the Tribe's cause of action in this case amounts to a collateral attack on the criminal cases filed in Wyandotte County District Court. Because the criminal proceedings were dismissed on July 7, 2004, this argument is no longer applicable.

## VI. Appropriate Relief

One of the most difficult issues in this case is determining the proper form of injunctive relief. The Tribe has asked the Court to prohibit and enjoin the State Defendants from "asserting jurisdiction over any gaming or related activity on the Shriner Tract." At the July 19, 2004 hearing, counsel for the Tribe represented to the Court that it was no longer seeking affirmative relief with respect to gaming and if successful in obtaining a preliminary

---

**90.** *United Keetoowah Band,* 927 F.2d at 1170.

**91.** 18 U.S.C. § 1166(d).

**92.** *See Lac du Flambeau Band v. State of Wis.,* 743 F.Supp. 645, 646 (W.D.Wis.1990)("Unless and until the state negotiates a tribal-state compact in which [the tribe] consents to the exercise of such jurisdiction, the United States has the exclusive authority to enforce

violations of state gambling laws on plaintiffs' reservations").

**93.** 222 F.R.D. 490 (D.Kan 2004).

**94.** *Id.* at 496–97.

**95.** *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971).

injunction, the Tribe did not intend to game on the Shriner Tract pending a final order from the NIGC. Without gaming, however, an injunction against enforcement against gaming would be a hollow victory. Moreover, the Tribe continues to seek mandatory relief requiring the State Defendants to return the property seized from the gaming facility. The Tribe has not addressed the issue of whether it should be permitted to game on the Shriner Tract. Even if the Secretary's decision to take the land into trust is upheld in *Governor v. Norton,* and the land is Indian land, that is not the end of the inquiry into the propriety of gaming under the NIGC. That regulatory body has issued a preliminary opinion that gaming on the Shriner tract is not proper. That order is not final, however, and the Court is not in a position to make a meaningful prediction as to the outcome of those proceedings.

It is the Court's intention in issuing a preliminary injunction to return the parties to their respective positions prior to the time enforcement action was taken by the State Defendants. While it was the State Defendants' enforcement action/raid of the casino that altered the status quo and became the impetus for this litigation, the Court notes that the Tribe also altered the status quo when it commenced gaming on the Shriner Tract prior to obtaining authority from the NIGC and prior to final judicial review of the Secretary's July 2003 order. The Tribe had no qualms about opening its gaming facility without authority from the NIGC and before final judicial resolution of the issues stemming from the 1996 Tenth Circuit orders. If the Court grants the Tribe the relief requested, it is not its intent for the Tribe to use the injunction as an impetus to commence gaming again. Accordingly,

**IT IS THEREFORE BY THE COURT ORDERED** that:

1. The Tribe's Motion for Preliminary Injunction (Doc. 98) is GRANTED. State Defendants are enjoined from exercising or asserting jurisdiction over any gaming or related activity on the Shriner Tract. To this end, the Tribe shall also be enjoined from conducting any gaming or related activities on the Shriner Tract.

2. State Defendants shall be permitted to continue the appeal of dismissal of the criminal action against Ellis Enyart.

3. State and Municipal Defendants are ordered to take all necessary steps to facilitate the return of the property seized from the Tribe, with the exception of the cash seized. State and/or Municipal Defendants shall deposit the cash seized into the Clerk of the Court to serve as security pursuant to Fed.R.Civ.P. 65(c). State Defendants are entitled to make copies of any seized records or files before they are returned.

4. This injunction shall be effective until such time as the Tribe's claims have been adjudicated on the merits, including issues in the related case of *Governor v. Norton,* 03–4140–JAR, or until further order of this Court.

**IT IS FURTHER ORDERED BY THE COURT** that:

5. The parties' respective motions relative to discovery (Docs.107, 113, 115, 116) are DENIED.

6. Municipal Defendant Marinovich and Miller's Motion to Dismiss (Doc. 134) is GRANTED WITH PREJUDICE; defendants' Motion to Supplement Authority (Doc. 136) is DENIED as moot.

7. The Tribe and the State Defendants' Motions to Supplement (Docs.131, 137) are GRANTED.

IT IS SO ORDERED.